This Opinion is a
Precedent of the TTAB

Mailed: November 20, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*The Heil Co.*
*v.*
*Tripleye GmbH*

———

Opposition No. 91277359

———

Cynthia Johnson Walden, Chris Dillon, Ryan Thomas, Nathan C. Ranns of Fish & Richardson P.C., for The Heil Co.

Roger L. Browdy, Ronni S. Jillions, Aoi Nawashiro of Browdy and Neimark, P.L.L.C., for Tripleye GmbH.

———

Before Lykos, Lynch, and Stanley,
 Administrative Trademark Judges.

Opinion by Stanley, Administrative Trademark Judge:

Pursuant to Section 66(a) of the Trademark Act, 15 U.S.C. § 1141f(a), Tripleye GmbH ("Applicant") filed a Request for Extension of Protection on the Principal Register of an international registration for the mark TRIPLEYE in standard characters for the following goods and services, as amended:[1]

---

[1] Application Serial No. 79320202, filed on September 16, 2021, with an effective filing date of March 22, 2021, based on International Registration No. 1612946.

Apparatus and instruments for controlling and monitoring vehicles, namely, simulators for the steering and control of vehicles; distance measuring apparatus; range finders for cameras; sensing systems in the nature of optical sensors, LIDAR sensors, ultrasonic sensors, acceleration sensors, electric sensors, proximity sensors, photoelectric sensors, vibration sensors, infrared sensors, motion recognizing sensors, position determining sensors, parking sensors; 3D sensing systems in the nature of optical sensors, LIDAR sensors, ultrasonic sensors, acceleration sensors, electric sensors, proximity sensors, photoelectric sensors, vibration sensors, infrared sensors, motion recognizing sensors, position determining sensors, parking sensors; sensing systems in the nature of optical sensors, LIDAR sensors, ultrasonic sensors, acceleration sensors, electric sensors, proximity sensors, photoelectric sensors, vibration sensors, infrared sensors, motion recognizing sensors, position determining sensors, parking sensors for monitoring and providing assistance with mapping and localization applications; measuring apparatus, namely, electronic distance meters; sensors for measuring depth; apparatus for the processing of images; downloadable computer software for use in database management, for use in electronic storage of data, for organizing and viewing digital images and photographs; downloadable computer programs using artificial intelligence for machine learning; downloadable computer programs using artificial intelligence for steering and control of vehicles; downloadable computer programs for tracking driver behaviour; downloadable computer programs for image processing; electronic cards for processing images; downloadable computer programs and downloadable software for image processing for mobile phones; central processing units for processing information, data, sound or images; data and image processing software, downloadable, for making three dimensional models; downloadable image recognition software; stereoscopes; stereoscopic apparatus, namely, stereoscopes; stereoscopic equipment for 3D viewing; cameras; digital cameras; flashlight apparatus for cameras; photographic lenses; lens filters for cameras; cameras for vehicles; industrial automation controls; industrial automation software, downloadable, to integrate manufacturing machine operations, track problems and generate production reports; downloadable vehicle control assistance software; driver assistance systems for motor vehicles, namely, computer hardware for tracking driver behaviour, optical sensors, LIDAR sensors, ultrasonic sensors, acceleration sensors, electric sensors, proximity sensors, photoelectric sensors, vibration sensors, infrared sensors, motion recognizing sensors, position determining sensors, parking sensors; hardware for electronic driving assistance systems; electronic parking assistance systems for motor vehicles, namely, parking sensors for vehicles; on-board electronic

systems for providing driving assistance, namely, computer hardware for tracking driver behavior, optical sensors, LIDAR sensors, ultrasonic sensors, acceleration sensors, electric sensors, proximity sensors, photoelectric sensors, vibration sensors, infrared sensors, motion recognizing sensors, position determining sensors, parking sensors; on-board electronic systems for providing parking assistance, namely, parking sensors for vehicles, in International Class 9; and

Technical service in the field of design and development of computer software for production testing, maintenance and monitoring of industrial installations, as well as design and development of calibration systems, namely, initial calibration, recalibration and continuous calibration in the nature of steering apparatus for vehicles, and related consultancy services; technical project planning services, design services, consulting services in relation to the aforementioned services, technological services relating to design, namely, project planning and design engineering of apparatus and instruments for controlling and monitoring vehicles, of industrial automation controls, of industrial automation software, of vehicle control assistance software, of hardware for electronic driving assistance systems and of on-board electronic systems for providing driving assistance; software design and development; design of motor vehicles; installation and implementation of computer software; maintenance and updating of computer software; technological research relating to computers; engineering services relating to robotics; development of computer systems for the processing of data, in International Class 42.

On July 11, 2022, The Heil Co. ("Opposer") filed a Notice of Opposition[2] opposing registration of the applied-for mark in both classes on the ground of priority and likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).[3] Opposer relies on alleged prior common law rights in the mark 3RD EYE in connection with "vehicle camera systems and monitors, fleet management software,

---

[2] On March 9, 2023, the IB processed a "Notification of Opposition periods beyond 18 months."

[3] Notice of Opposition at ¶¶ 13-22, 1 TTABVUE 12-13. Citations in this opinion refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear.

vehicle collision avoidance radar systems and vehicle analytics solutions"[4] and also pleads ownership of the following trademark registrations:[5]

> Registration No. 4340849 for the mark 3RD EYE in standard characters for "Apparatus for recording, transmitting and reproducing sound and images; Cameras; Photographic cameras; Vehicle detection equipment, namely, display monitors, computers, image sensors, video cameras, and operating system and application software to detect vehicle location; Vehicle safety equipment, namely, an on-board vehicular surveillance system comprised of cameras and monitors for exposing and eliminating the blind spots on both sides of the vehicle; Visual and audio recordings featuring audible sound alerts for use with on-board vehicular surveillance system that incorporate day and night rear vision cameras" in International Class 9;[6]

> Registration No. 5657073 for the mark 3RD EYE in standard characters for "Vehicle safety equipment, namely, an on-board vehicular surveillance system comprised of cameras and monitors; Visual and audio recordings featuring audible sound alerts for use with on-board vehicular surveillance systems; Vehicle detection equipment, namely, display monitors, computers, image sensors, video cameras, and operating system and application software to detect vehicle location; downloadable software in the nature of a mobile application for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicle safety and operational systems" in International Class 9 and "Providing temporary use of on-line non-downloadable software for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicle safety and operational systems" in International Class 42;[7]

---

[4] Notice of Opposition at ¶ 4, 1 TTABVUE 7.

[5] Notice of Opposition at ¶¶ 6-7, 1 TTABVUE 7-10. Opposer also pleaded ownership of Registration No. 5217816 for the mark 3RD EYE CAM in standard characters for goods in International Class 9, with "CAM" disclaimed (Notice of Opposition at ¶ 6, 1 TTABVUE 9), but this registration was canceled on December 22, 2023.

Opposer's attachment of TSDR printouts of its pleaded registrations as Exhibit A to the Notice of Opposition (1 TTABVUE 14-31), showing current status and title, suffices to make the registrations of record for purposes of trial. *See* Trademark Rule 2.122(d)(1), 37 C.F.R. § 2.122(d)(1).

[6] Registered May 28, 2013 on the Principal Register; renewed.

[7] Registered January 15, 2019 on the Principal Register.

Registration No. 4340851 for the composite mark for "Apparatus for the recording, transmission and reproduction of sound and images; cameras; vehicle detection equipment, namely, display monitors, computers, image sensors, video cameras, and operating system and application software to detect vehicle location; vehicle safety equipment, namely, an on-board vehicular surveillance system comprised of cameras and monitors for exposing and eliminating the blind spots on both sides of the vehicle; visual and audio recordings featuring audible sound alerts for use with on-board vehicular surveillance system that incorporate day and night rear vision cameras" in International Class 9;[8] and

Registration No. 5657072 for the composite mark for "Vehicle safety equipment, namely, an on-board vehicular surveillance system comprised of cameras and monitors; Visual and audio recordings featuring audible sound alerts for use with on-board vehicular surveillance systems; Vehicle detection equipment, namely, display monitors, computers, image sensors, video cameras, and operating system and application software to detect vehicle location; downloadable software in the nature of a mobile application for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicle safety and operational systems" in International Class 9 and "Providing temporary use of on-line non-downloadable software for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicle safety and operational systems" in International Class 42.[9]

---

[8] Registered May 28, 2013 on the Principal Register; renewed. The description of the mark reads: "The mark consists of the text '3rd', a stylized design of a human eye, and the text 'EYE', wherein the text and the eye are surrounded by incomplete, curved lines."

[9] Registered January 15, 2019. The description of the mark reads: "The mark consists of two intersecting ovals with a circle in the middle with '3RD' on the left side of the circle and 'EYE' on the right side of the circle."

By way of its Answer, Applicant admits that "Opposer is the record owner of the listed US trademark registrations" in the Notice of Opposition.[10] Applicant otherwise denies the salient allegations in the Notice of Opposition.[11] Applicant also purported to plead two affirmative defenses, namely that no likelihood of confusion is caused by Applicant's use of its applied-for mark and that Opposer will not be damaged by the registration of Applicant's applied-for mark.[12] Neither of these are true affirmative defenses but instead are mere amplifications of its denials. *See Mars Generation, Inc. v. Carson*, 2021 USPQ2d 1057, at \*2 (TTAB 2021); *DeVivo v. Ortiz*, 2020 USPQ2d 10153, at \*1 (TTAB 2020). Regardless, Applicant did not pursue any affirmative defenses at trial or address them in its brief, thereby forfeiting or impliedly waiving them.[13] *See Keystone Consol. Indus. v. Franklin Inv. Corp.*, 2024 USPQ2d 1425, at \*1 n.10 (TTAB 2024) ("Affirmative defenses that were asserted in an answer but then not pursued at trial may be deemed impliedly waived, while affirmative defenses that were never asserted may be deemed forfeited."); *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd*, 565 Fed. App'x 900 (Fed. Cir. 2014) (mem.).

---

[10] Answer at ¶ 6, 4 TTABVUE 7. *See also* Answer at ¶ 14, 4 TTABVUE 11 (same admission).

[11] Answer, 4 TTABVUE.

[12] Answer, 4 TTABVUE 14-15.

[13] We note the admonition of our primary reviewing court regarding the distinction between waiver and forfeiture. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 2020 USPQ2d 11465, at \*3 (Fed. Cir. 2020) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (internal quotation marks omitted)).

The case is fully briefed. Opposer, as plaintiff in the opposition proceeding, bears the burden of establishing its entitlement to a statutory cause of action and substantive claim by a preponderance of the evidence. *See Jansen Enters. Inc. v. Rind*, 85 USPQ2d 1104, 1107 (TTAB 2007).

## I.    The Record[14]

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Applicant's application file.[15] The parties also submitted:

A.    Opposer's Main Trial Period

1.    Testimony Declaration with exhibits of Kyle Kummer, Vice President of Customer Success at 3rd Eye Cam, a division of Opposer ("Kummer Decl.") (11 TTABVUE – confidential; 12 TTABVUE – public).[16]

2.    Opposer's First Notice of Reliance: Opposer's certificates of registration and official records for Opposer's pleaded marks (13 TTABVUE).

---

[14] The Board approved (23 TTABVUE 3) the parties' stipulation (10 TTABVUE 2) that "each document produced in discovery in this Opposition proceeding is authentic for purposes of potential admission into evidence in this proceeding" and "each party may introduce by Notice of Reliance in this proceeding the documents produced by the other party." The parties, however, "reserve[d] their respective rights to make substantive objections to any document on the bases of relevance, competence, materiality, and/or weight." 10 TTABVUE 2.

[15] Opposer submitted the file history for Applicant's involved application as its Second Notice of Reliance. *See* 14 TTABVUE. This is superfluous inasmuch as the file of the opposed application is automatically part of the record, without any action by either party. *See* Trademark Rule 2.122(b).

[16] Both parties filed certain information and documents under seal that have been designated as "Confidential" or "Confidential Attorneys' Eyes Only" pursuant to the Board's Standard Protective Order. We have identified the under-seal filings as "confidential," along with the corresponding TTABVUE citation, where appropriate.

3. Opposer's Third Notice of Reliance: Certain of Applicant's discovery responses (15 TTABVUE – confidential; 16 TTABVUE – public).[17]

4. Opposer's Fourth Notice of Reliance: Documents produced by the parties (17 TTABVUE – confidential; 18 TTABVUE – public).

5. Opposer's Fifth Notice of Reliance: Publicly-available Internet materials (19 TTABVUE).

B. Applicant's Main Trial Period

1. Testimony Declaration with exhibits of François Dubuisson, co-founder and Chief Executive Officer of Applicant ("Dubuisson Decl.") (30-32 TTABVUE – confidential; 33-34 TTABVUE – public).

2. Applicant's First Notice of Reliance: Certain of Opposer's discovery responses (35 TTABVUE).

3. Applicant's Second Notice of Reliance: Third-party trademark registrations (36 TTABVUE).

4. Applicant's Third Notice of Reliance: Publicly available Internet materials (37 TTABVUE).

5. Applicant's Fourth Notice of Reliance: Documents produced by the parties (38 TTABVUE).

6. The cross-examination deposition transcript of Kyle Kummer with exhibits (40 TTABVUE – confidential; 41 TTABVUE – public).[18]

---

[17] The parties introduced responses to requests for admission including both admissions and denials. *See* Opposer's Third Notice of Reliance ("NOR"), OTX 26, 16 TTABVUE 58-78; Applicant's First NOR, ATX 18, 35 TTABVUE 69-87. We consider only admissions. *See* Trademark Rule 2.120(k)(3)(i), 37 C.F.R. § 2.210(k)(3)(i); *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1501 n.11 (TTAB 2015) (Board considered only opposer's admissions, not denials, in response to applicant's requests for admission).

[18] On November 16, 2023, Applicant filed the certified and signed transcript from the cross-examination of Mr. Kummer (27 TTABVUE – confidential; 28 TTABVUE – public). Incorrect exhibits, however, were inadvertently attached to the transcript as filed. 39 TTABVUE 2. As such, Applicant filed a corrected version on November 27, 2023 (40 TTABVUE – confidential; 41 TTABVUE – public). Mr. Kummer was cross-examined remotely via videoconference using Zoom, with the court reporter and questioning attorney in different locations than the

C.    Opposer's Rebuttal Period

1.    Rebuttal Testimony Declaration of Mr. Kummer ("Kummer Rebuttal Decl.") (44 TTABVUE – confidential; 45 TTABVUE – public).

II.    Applicant's Evidentiary Objections

A.    Opposer's Family of EYE-Formative Marks Evidence

Opposer in its main brief argues that it owns a family of EYE-formative marks "used in connection with its comprehensive suite of safety, operations, maintenance, and accounting tools, including EYE-SITE, VERIF-EYE, OPTIM-EYES, PURIF-EYE, and CERTIF-EYE."[19] However, Opposer did not plead a "family of 3RD EYE Marks" or "a family of EYE-formative marks" in its Notice of Opposition. Applicant objects to the introduction of evidence pertaining to Opposer's purported family of EYE-formative marks.[20]

Under the ninth *DuPont* factor, "[a] family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J&J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991). *See also Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001); *Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, 2022 USPQ2d 1035,

---

witness. We commend the parties for cooperating and coordinating the cross-examination by remote means without Board intervention.

[19] Opposer's Br., 47 TTABVUE 14.

[20] Applicant's Br., 48 TTABVUE 41-42.

at \*6 (TTAB 2022) ("Recognition of the family of marks is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family."). An "opposer relying on a family of marks is relying on common law rights in the alleged family." *New Era Cap Co., Inc. v. Pro Era, LLC,* 2020 USPQ2d 10596, at \*7 (TTAB 2020). Unless tried by express or implied consent of the parties under Fed. R. Civ. P. 15(b), "[a] plaintiff must plead ownership of a family of marks in its complaint in order to rely on the marks as a family as a basis for sustaining the opposition at trial or in a motion for summary judgment." *Wise F&I, LLC v. Allstate Ins. Co.,* 120 USPQ2d 1103, 1107 (TTAB 2016). *See also Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.,* 98 USPQ2d 1921, 1927 (TTAB 2011), *aff'd,* 188 F. Supp.3d 22, (D.D.C. 2016), *aff'd,* 743 F. App'x 457, 128 USPQ2d 1172 (D.C. Cir. 2018) (petitioner's "family of marks" claim, raised for the first time in its brief not considered because it was neither pleaded nor tried by the parties); *Standard Knitting Ltd. v. Toyota Jidosha K. K.,* 77 USPQ2d 1917, 1929 n.17 (TTAB 2006) ("Opposer's reference to a family of marks in its brief, will not be considered as this claim was neither pleaded nor tried by the parties.").

Here, Opposer's witness Mr. Kummer testified that "[i]n addition to its ownership of the family of 3RD EYE Marks, Opposer owns a family of EYE-formative marks used in connection with its comprehensive suite of safety, operations, maintenance, and accounting tools" and that "[c]onsumers are accustomed to encountering these EYE-formative marks alongside the 3RD EYE Marks."[21] When Applicant cross-

---

[21] Kummer Decl. at ¶ 15, 12 TTABVUE 6.

examined Mr. Kummer, Applicant objected to Mr. Kummer's reference to a "family of EYE-formative marks" in his testimony declaration,[22] and Applicant renewed its objection in its brief, objecting to Opposer's reliance on its alleged "family of EYE-formative marks" because "Opposer's Notice of Opposition does not contain any reference to such a family of marks."[23] In its rebuttal brief, Opposer argues that the Board may consider its alleged family of marks because

> Opposer does not rely on its use of EYE-formative marks as the basis for its likelihood of confusion claim. Instead, these other EYE-formative marks owned by Opposer and thematically integrated into its 3RD EYE business provide a realistic depiction of the way consumers and purchasers encounter Opposer's 3RD EYE Marks in the marketplace.[24]

After Applicant objected to Mr. Kummer's testimony concerning a "family of marks" during the cross-examination, Opposer did not move to amend its Notice of Opposition or otherwise move to reopen any dates in the proceeding. In view of Applicant's renewed objection in its brief,[25] and because Opposer may not rely on an unpleaded "family of marks," we must determine whether the issue of Opposer's ownership of a "family of marks" was tried by implied consent under Fed. R. Civ. P. 15(b)(2), made applicable to Board proceedings by Trademark Rule 2.116(a), 37 C.F.R. § 2.116. Implied consent to the trial of an unpleaded issue can be found only where the non-offering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support

---

[22] Kummer Cross-Exam. Tr. at 7:10-21, 41 TTABVUE 8.

[23] Applicant Br., 48 TTABVUE 46-47.

[24] Opposer's Rebuttal Br., 49 TTABVUE 7.

[25] Applicant's Br., 48 TTABVUE 46-47.

of the issue. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 507.03(b) (2024) and cases cited therein.

Here, we find that Applicant timely raised its objection to Mr. Kummer's testimony concerning a "family of marks" during the cross-examination of Mr. Kummer and timely renewed its objection in its brief. *See Moke Am. LLC v. Moke USA LLC*, 2020 USPQ2d 10400, at \*4 (TTAB 2020), *rev'd on other grounds sub nom.*, *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 671 F. Supp. 3d 670, 2023 USPQ2d 532 (E.D. Va. May 3, 2023). In view of Applicant's timely objection, we find that the issue of whether Opposer owns a "family of marks" was not tried by implied consent.[26] *See H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1715, 1721 (TTAB 2008) ("Because opposer objected to the testimony and argument regarding applicant's use of the mark ONE FABULOUS FIT, applicant's attempt to tack the use of that mark onto ONE FAB FIT was not tried by implied consent").

Applicant's objection to Opposer's reliance on its alleged "ownership of the family of 3RD EYE Marks" and ownership of "a family of EYE-formative marks" is **sustained**.[27] *See Productos Lacteos Tocumbo*, 98 USPQ2d at 1927 (petitioner's

---

[26] In any event, an opposer relying upon a "family of marks" must prove common law rights in the alleged family. *See New Era Cap Co.*, 2020 USPQ2d 10596, at \*7. Ownership of multiple registrations with a common term does not prove ownership in a family of marks. Opposer has not sufficiently proven that its alleged EYE-formative marks are used in such a way that the public associates not only the individual marks, but the common characteristic of the family (i.e., "EYE"), with Opposer. *See J&J Snack Foods Corp.*, 18 USPQ2d at 1891-92.

[27] Although we have sustained Applicant's objection to Opposer's reliance on a purported "family of marks," we have not excluded Opposer's Internet evidence that depicts its 3RD EYE mark alongside Opposer's use of other "eye"-formative terms and phrases. *See, e.g.*, OTX 2 to Kummer Decl., 12 TTABVUE 56-111. "The Board will "accord [this] evidence whatever

"family of marks" claim, raised for the first time in its brief not considered because it was neither pleaded nor tried by the parties).

###### B.     Opposer's Evidence of Sales Figures and Subscription Counts

During the discovery period, Opposer produced revenue information concerning the sale of certain of its hardware between the years 2019 and 2022.[28] Relying on the information produced during discovery, Mr. Kummer testified that "[u]nit sales from Opposer's hardware offered under the 3RD EYE Marks has [sic] grown substantially over time and has [sic] remained significant over at least the past five years," and in so testifying, Mr. Kummer identified the same sales figures for the years 2019-2022 that were produced during discovery.[29] The day before Mr. Kummer's cross-examination, Opposer produced a new document marked as Opposer's Trial Exhibit No. 33 ("OTX 33"), which summarizes Opposer's revenue from 2019-2022 purported to be from the sale of Opposer's hardware, installation, and software, as well as subscription counts, as related to its 3RD EYE marks.[30] The hardware revenue figures in OTX 33 differ substantially from those Opposer previously provided, and

---

[28] probative value it deserves, if any at all[.]" *Hunt Control Sys. Inc. v. Koninkijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011).

[28] Applicant's Br., 48 TTABVUE 47-48 n.1. During discovery, Applicant requested a broad range of information concerning Opposer's sales and advertising expenses for Opposer's relevant goods and services, including, for example, sales information both by units and dollars. Applicant's First NOR, 35 TTABVUE 19-23 (Request for Production Nos. 8-11), 51-54 (Interrogatory Nos. 9-11). Opposer lodged a series of objections as to the scope of Applicant's requests and refused to produce documents responsive to the requests. *Id.* Opposer expressed a willingness "to meet and confer" as to each of these requests, but it is unclear whether the parties agreed to narrow the scope of any of the requests.

[29] Kummer Decl. at ¶ 19, 12 TTABVUE 8. The sales figures were redacted in the public version; they were provided under seal at 11 TTABVUE.

[30] Applicant's Br., 48 TTABVUE 47-49.

Opposer had not previously provided the revenue figures for installation, software and subscriptions, despite their falling within the scope of Applicant's discovery requests. During the cross-examination of Mr. Kummer on September 13, 2023, Applicant did not ask any questions regarding the number of sales or amount of revenue Opposer made or received from sales of the products under the 3RD EYE marks.[31] During redirect examination of Mr. Kummer, Opposer asked questions directed to paragraph 19 of the Kummer Declaration and then introduced OTX 33 as an exhibit and asked questions about the figures reflected therein.[32] Applicant objected to the former as new testimony that is not appropriate for redirect examination and to the latter as being "[i] beyond the scope of this cross-examination testimony, [ii] as not having been produced during discovery and [iii] … attempting to introduce additional exhibits after the close of opposer's testimony period."[33]

In its brief, Applicant renewed its objection concerning Opposer's reliance on OTX 33 and Mr. Kummer's testimony concerning the same.[34] In its rebuttal brief, Opposer defends the production of OTX 33 and its reliance on the same as "a proper supplement under Fed. R. Civ. P. 26(e)."[35] Opposer further argues that Applicant submitted OTX 33 with its own trial evidence and therefore cannot now object to it.[36]

---

[31] Kummer Cross-Exam. Tr., 40 TTABVUE 9-40 (Confidential) and 41 TTABVUE 9-40 (Public).

[32] Kummer Cross-Exam. Tr., 40 TTABVUE 40-42 (Confidential). This testimony is redacted from the public version of the transcript.

[33] Kummer Cross-Exam. Tr. at 43:3-12, 41 TTABVUE 44.

[34] Applicant's Br., 48 TTABVUE 47-49.

[35] Opposer's Rebuttal Br., 49 TTABVUE 8-9.

[36] Opposer's Rebuttal Br., 49 TTABVUE 9.

We **sustain** Applicant's objection. First, OTX 33 was not attached as an exhibit to the Kummer Declaration. Opposer produced the exhibit the day before the cross-examination, and during Mr. Kummer's cross-examination, Applicant did not question Mr. Kummer about Paragraph 19 of the Kummer Declaration or OTX 33 specifically, or even Opposer's revenues generally. We find that Opposer's redirect examination of Mr. Kummer concerning the substance of Paragraph 19 of the Kummer Declaration and OTX 33 was outside the scope of the cross-examination. *See Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1417 (TTAB 2008).

Second, the revenue information reflected in OTX 33 is an untimely supplementation of the revenue concerning hardware sales and is an untimely production of revenue information concerning software sales and subscription counts. A party that fails to provide information requested during discovery, or provides an untimely supplement, may be subject to an "estoppel sanction," and so will be precluded from using that information or witness at trial, unless the failure to disclose was substantially justified or is harmless. *Great Seats Inc. v. Great Seats Ltd.*, 100 USPQ2d 1323, 1328 (TTAB 2011). *See, e.g., Panda Travel, Inc. v. Resort Option Enterprises, Inc.*, 94 USPQ2d 1789, 1792-93 (TTAB 2009) (documents not produced until after the start of trial stricken). *See also* TBMP § 527.01(e) ("Estoppel Sanction") and cases cited therein. The duty to supplement disclosures and discovery responses in proceedings before the Board is governed by Fed. R. Civ. P. 26(e). *See* Trademark Rule 2.116(a), 37 C.F.R. § 2.116(a); *see also* TBMP § 408.03. Under Rule 26(e), a party that has responded to a request for discovery is under a duty to

supplement or correct the disclosure or response in a timely manner to include information under the particular circumstances specified in Rule 26(e)(1)(A). *See* TBMP § 408.03. Where there is prompt supplementation of the disclosure, either upon the initiative of the disclosing party, or after notification by the adverse party that the disclosure was incomplete, and while the discovery period remains open, the Board's policy is that the information originally omitted will not be excluded. *Id.*

Here, the revenue information concerning the hardware sales about which Mr. Kummer testified in the Kummer Declaration was produced during discovery on March 17, 2023.[37] As such, it was fair for Mr. Kummer to testify about such sales. OTX 33, however, was not produced until September 12, 2023 (i.e., approximately two months after the Kummer Declaration was filed). Opposer does not explain why it did not move to reopen the time for Opposer to submit a supplemental declaration of Mr. Kummer. We further note that the hardware revenue figures differ significantly between Mr. Kummer's testimony on July 19, 2023 and those identified in OTX 33 on September 12, 2023. This is not a situation where Opposer was simply updating sales figures for the months that passed since the original figures were produced. Rather, Opposer attempted to rely upon vastly revised revenue figures for years 2019-2022 for an expanded scope of hardware.[38]

Furthermore, Opposer never produced sales figures for its software sales or subscription counts during discovery, and Mr. Kummer did not testify about those

---

[37] Applicant's Br., 48 TTABVUE 47-48 n.1.

[38] Kummer Cross-Exam. Tr., 40 TTABVUE 40-42 (Confidential). This testimony is redacted from the public version of the transcript.

sales and subscription counts in his testimony declaration. We do not consider these figures to be a "supplementation" of the previously-produced hardware sales information. Rather, they are an untimely production of information that was never produced during discovery.

Opposer does not dispute that sales information was requested by Applicant during discovery (and produced by Opposer as to certain hardware sales), and Opposer does not explain how its late production of sales information and subscription counts was "substantially justified." Nor do we view Opposer's late responses as "harmless" given that Opposer points to these sales figures as support that Opposer's pleaded marks fall on the high end of the fame/commercial strength spectrum under the fifth *DuPont* factor. Additionally, Opposer's gamesmanship of waiting until the eve of the cross-examination to produce OTX 33 had the potential effect of forcing Applicant to choose between: (1) asking Opposer about the revenues identified in the Kummer Declaration and risk opening the door on redirect examination to questions about the substance of OTX 33; or (2) not asking any questions about Opposer's hardware revenues so as to avoid the risk of opening the door to redirect questions concerning the substance of OTX 33, even though the hardware sales information produced during discovery were properly identified in the Kummer Declaration. In view thereof, the estoppel sanction applies.

Lastly, Opposer's argument that the Board should consider OTX 33 because Applicant "affirmatively entered [OTX 33] into the record"[39] is unpersuasive. The

---

[39] Opposer's Rebuttal Br., 49 TTABVUE 9.

cases cited by Opposer concern situations where an applicant submitted evidence with its own notice of reliance and then subsequently objected to that same evidence.[40] OTX 33 was not submitted with a notice of reliance, and OTX 33 was not introduced by Applicant as an exhibit during the cross-examination of Mr. Kummer. Rather, Opposer introduced OTX 33 as an exhibit during the redirect examination of Mr. Kummer, and Applicant timely objected during the redirect examination. Applicant filed the cross-examination testimony (which included Opposer's redirect examination, OTX 33 as introduced by Opposer during the redirect examination, and Applicant's objection on the record concerning OTX 33). Opposer was on notice of Applicant's objection, and never moved to reopen Opposer's trial period to supplement Mr. Kummer's trial testimony.

For the reasons stated herein, Applicant's objection to Mr. Kummer's redirect testimony concerning Paragraph 19 of the Kummer Declaration, OTX 33, and Opposer's reliance on OTX 33 itself is **sustained**. Exhibit OTX 33 has been given no consideration.

III.    Judicial Notice

Applicant requests that the Board take judicial notice that "autonomous vehicles are (or will be when they reach the market) expensive purchases."[41] Opposer objects to Applicant's request.[42]

---

[40] *Id.*

[41] Applicant's Br., 48 TTABVUE 33-34.

[42] Opposer's Rebuttal Br., 49 TTABVUE 16.

The Board may take judicial notice of a fact that is not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). *See also* TBMP § 704.12(a). The Board will take judicial notice of an adjudicative fact not subject to reasonable dispute, as defined in Fed. R. Evid. 201(b), if a party (1) requests that the Board do so, and (2) supplies the necessary information. *See* TBMP § 704.12(b).

Although we recognize that vehicles in general are not inexpensive products, Applicant has not provided any information to support that autonomous vehicles specifically are expensive products or even defined what price range of vehicles it considers "expensive." Applicant has not provided any information to support its request for judicial notice, let alone "sources whose accuracy cannot reasonably be questioned." In view thereof, Applicant's request that we take judicial notice that "autonomous vehicles are (or will be when they reach the market) expensive purchases" is **denied**.

IV.    The Parties

A.    Opposer

3rd Eye Cam is a division of Opposer.[43] Opposer owns and manages 3rd Eye Cam's business and intellectual property.[44] 3rd Eye Cam provides vehicle surveillance and detection systems and equipment, including hardware, software, camera and

---

[43] Kummer Decl. at ¶ 1, 12 TTABVUE 2.

[44] Kummer Decl. at ¶ 10, 12 TTABVUE 3.

monitors, and related software-based services for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicles for vehicle and driver safety, collision avoidance, vehicle analytics, and fleet tracking and management.[45] Approximately twenty years ago, Opposer's predecessor in interest, Alliance Wireless Technologies, Inc., selected and developed the mark

in consultation with a third party agency.[46] Since at least as early as 2004, Opposer (including via its predecessor-in-interest) has marketed and offered its vehicle surveillance and detection systems, and related hardware, software and software-based services under the mark 3RD EYE.[47]

Opposer offers a variety of physical products, including vehicle camera systems, monitors, and collision avoidance radar under its 3RD EYE MOBILE mark.[48] In addition, Opposer offers a suite of fleet management reporting and recording tools and software under its 3RD EYE DIGITAL mark that utilize Opposer's 3RD EYE MOBILE products to collect, analyze, and report data.[49]

---

[45] *Id.*

[46] Applicant's First NOR, 35 TTABVUE 66 (Opposer's Response to Interrogatory No. 28).

[47] Kummer Decl. at ¶ 11, 12 TTABVUE 3. Opposer acquired rights in certain of its pleaded 3RD EYE marks via a merger between Opposer and Alliance Wireless Technologies, Inc., effective September 23, 2016. Opposer's First NOR, 13 TTABVUE 10, 23, 36 (TSDR records showing the assignment history for Opposer's pleaded registrations).

[48] Kummer Decl. at ¶ 14, 12 TTABVUE 6.

[49] *Id.*; *see also* OTX 1 to Kummer Decl., 12 TTABVUE 14-55.

Opposer markets and offers its goods and services under the 3RD EYE mark to consumers and fleets in a variety of industries, including construction, education, logistics, public services, refuse, transportation, trucking, and utilities.[50] Opposer also markets and sells its goods and services under the 3RD EYE mark directly to Original Equipment Manufacturers ("OEMs") to enable installation at the factory level.[51] Opposer's customers include persons and businesses who purchase, manage, operate, or otherwise work with vehicles, machinery, or fleets comprised of the same.[52]

Opposer's goods and services are offered and sold under the 3RD EYE mark through an approved network of Opposer-authorized third-party dealers throughout the United States.[53] These third-party dealers offer an array of vehicles and equipment to consumers from various sources.[54]

Opposer promotes its goods and services offered under the 3RD EYE mark through its dedicated 3RD EYE website at https://3rdeyecam.com/.[55] The 3RD EYE website details, inter alia, Opposer's products and solutions and the variety of

---

[50] Kummer Decl. at ¶ 20, 12 TTABVUE 8; Kummer Rebuttal Decl. at ¶ 14, 45 TTABVUE 5; *see also* OTX 4 to Kummer Decl., 12 TTABVUE 127-201 (screenshots from 3rd Eye's website); Opposer's Fifth NOR, OTX 29, 19 TTABVUE 6-22 (screenshots from 3rd Eye's website).

[51] Kummer Cross-Exam. Tr. at 19:17-23, 41 TTABVUE 20.

[52] Kummer Decl. at ¶ 21, 12 TTABVUE 8.

[53] Kummer Decl. at ¶ 22, 12 TTABVUE 8-9.

[54] *Id.*

[55] Kummer Decl. at ¶ 24, 12 TTABVUE 9; *see also* OTX 6 to Kummer Decl., 12 TTABVUE 204-396 (screenshots from 3rd Eye's website).

industries Opposer serves, and includes news articles and videos regarding Opposer's goods and services.[56]

Opposer regularly attends industry and trade conferences and exhibitions to promote its goods and services offered under the 3RD EYE mark, including, for example, the CONEXPO-CON/AGG (a construction trade show), WasteExpo (a solid waste, recycling, organics, and sustainability tradeshow), the National Waste & Recycling Association Awards, and the Electric Utility Fleet Managers Conference.[57] Opposer also places print and digital advertisements for its goods and services offered under the 3RD EYE mark in trade publications[58] and markets and promotes its goods and services offered under the 3RD EYE mark through social media.[59] Opposer has been the subject of unsolicited media and trade articles discussing its goods and services offered under the 3RD EYE mark [60] and has issued press releases regarding its goods and services offered under the 3RD EYE mark, as well as produced a variety of pamphlets, "one-sheets," flyers, and point-of-sale materials promoting and advertising its goods and services offered under the 3RD EYE mark.[61]

---

[56] *Id.*

[57] Kummer Decl. at ¶ 26, 12 TTABVUE 9-10; *see also* OTX 8 to Kummer Decl., 12 TTABVUE 414-427 (photographs depicting Opposer's participation in trade shows).

[58] Kummer Decl. at ¶ 28, 12 TTABVUE 10; *see also* OTX 10 to Kummer Decl., 12 TTABVUE 430-434 (sample advertisements featuring Opposer's 3RD EYE marks).

[59] Kummer Decl. at ¶ 29, 12 TTABVUE 10; *see also* OTX 11 to Kummer Decl., 12 TTABVUE 435-527 (screenshots printed from Opposer's social media pages).

[60] Kummer Decl. at ¶ 30, 12 TTABVUE 10; *see also* OTX 12 to Kummer Decl., 12 TTABVUE 528-38 (three third-party media articles).

[61] Kummer Decl. at ¶¶ 31-32, 12 TTABVUE 11-12; *see also* OTX 13 to Kummer Decl., 12 TTABVUE 539-57 (samples of Opposer's press releases printed by third parties); OTX 14 to

### B.     Applicant

Applicant was launched in 2013 as a research and development group in statistical computer vision for 3D sensing applications under the name Myestro Interactive GmbH.[62] In November 2020, the company changed its name to Tripleye GmbH.[63] According to its CEO and co-founder, in 2020, as Applicant started the commercialization of its technology, Applicant renamed the company using what it claims to be a newly created word − "Tripleye," − which combined the word "eye," meaning related to vision, and the word "triple," meaning the system having tripled vision (based on three cameras).[64]

Applicant's technology utilizes tripled-camera systems, which allow Applicant to create redundancy for reaching functional-safety standards as set forth by International Organization for Standardization, a key aspect of certification for Level 4/Level 5 automated vehicles.[65] "Level 4" is defined as "High automation - The vehicle can complete travel autonomously under normal environmental conditions, not requiring driver oversight" and "Level 5" is defined as "Full autonomy - The vehicle can complete travel autonomously in any environmental conditions."[66]

---

Kummer Decl. (public), 12 TTABVUE 558-586 (samples of Opposer's promotional materials); OTX 14 to Kummer Decl. (confidential), 11 TTABVUE 562-593) (same).

[62] Dubuisson Decl. at ¶¶ 8-9, 33 TTABVUE 4-5.

[63] *Id.*

[64] *Id.*

[65] Dubuisson Decl. at ¶¶ 9-10, 33 TTABVUE 4-5.

[66] *Id.*; *see also* ATX 1 to Dubuisson Decl., 33 TTABVUE 21-43 (Wikipedia webpage on "Vehicular Automation").

Applicant is currently commercializing, outside of the United States, different products under the names: TRIPLEYE SENSE and TRIPLEYE ORIONX, as well as TRIPLEYE SLAM.[67] Applicant's next generation All-Weather Vision camera platform for Level 4/Level 5 autonomous vehicles is called TRIPLEYE AW3D.[68] TRIPLEYE SENSE is used for software for a 3D sensing system for Level 4/Level 5 vehicle perception.[69] TRIPLEYE ORIONX is used for software systems providing engineering teams with autonomous software applications (e.g., path planning) for designing Level 4/Level 5 autonomous vehicles.[70] TRIPLEYE SLAM is used for localization of the autonomous Level 4/Level 5 vehicle.[71]

Applicant has been marketing and selling its products and services under its TRIPLEYE mark in Europe since 2020.[72] Beginning in April 2021, Applicant started a marketing campaign in the United States, by emailing various vehicle manufacturers, with the emails introducing Applicant as follows:

> Tripleye, a startup that has developed a Level 4/5 automation camera-only sensing system that covers 360 degrees of the environment, reading both distance and texture with no additional sensor needed.
>
> Our objective is to make full automation possible at a fraction of the cost of other sensing systems for Level 4/5 automation (e.g., LIDAR) while improving functional safety and functionality. …[73]

---

[67] Dubuisson Decl. at ¶ 11, 33 TTABVUE 6.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] Dubuisson Decl. at ¶ 12, 33 TTABVUE 6.

[73] *Id.*

Applicant provides modules that vehicle manufacturers need to build autonomous vehicles for a variety of industries, including, for example, "mining and construction," "logistics," and "marine and ports."[74] Applicant intends to sell to vehicle manufacturers who will install TRIPLEYE software and hardware on their vehicles as original equipment.[75] Applicant does not currently have any plans to enter the add-on technologies market.[76] Outside of the United States, Applicant does not market its products and services to any third party distributors or after-market equipment sellers, and Applicant has no intent to do so in the U.S. market.[77] Applicant does not expect that its TRIPLEYE mark will be presented to the public in any way when the OEM sells to its customers Level 4/Level 5 autonomous vehicles built using TRIPLEYE systems.[78] Applicant intends for systems bearing the TRIPLEYE mark to be commercialized to OEM's and not to consumers of Level 4/Level 5 autonomous vehicles.[79]

## V. Applicant's Unconsented Motion to Amend

At the outset, we address Applicant's motion to amend its identification of goods and services. On June 17, 2023, Applicant filed a motion to amend the identification of goods and services by adding "all of the above solely for use in Level 4 or Level 5

---

[74] Dubuisson Decl. at ¶ 17, 33 TTABVUE 8; *see also* Opposer's Fifth NOR, OTX 30, 19 TTABVUE 38-47 (screenshots of Applicant's website).

[75] Dubuisson Decl. at ¶ 14, 33 TTABVUE 7-8.

[76] *Id.*

[77] Dubuisson Decl. at ¶ 15, 33 TTABVUE 8.

[78] Dubuisson Decl. at ¶ 24, 33 TTABVUE 10.

[79] *Id.*; *see also id.* at 15, ¶ 36.

autonomous vehicles" to the International Class 9 goods and "all of the above solely for use in or in the field of Level 4 or Level 5 autonomous vehicles" to the International Class 42 services.[80] Opposer objected to the amendment, arguing that Applicant failed to meet the conditions required under the Board's case law for entry of an unconsented amendment to the identification of goods and services prior to trial.[81] On August 24, 2023, the Board issued an order deferring the motion to amend until trial.[82]

Trademark Act Section 18, 15 U.S.C. § 1068, gives the Board the equitable power to, inter alia, restrict the goods or services identified in an application or registration. *See also* Trademark Rule 2.133(a), 37 C.F.R. § 2.133(a) ("[a]n application subject to an opposition may not be amended in substance nor may a registration subject to a cancellation be amended or disclaimed in part, except with the consent of the other party or parties and the approval of the Trademark Trial and Appeal Board, or upon motion granted by the Board.").

An acceptable amendment to the identification of goods or services may be permitted, even where an opposer objects, if:

(1)     the proposed amendment serves to limit the broader identification of goods or services;

(2)     the applicant consents to the entry of judgment with respect to the broader identification of goods or services present at publication; and

---

[80] 7 TTABVUE 2-6.

[81] 9 TTABVUE 5-8.

[82] 23 TTABVUE.

> (3)     if the applicant wishes to avoid the possibility of a res judicata effect by the entry of judgment on the original identification, the applicant must make a prima facie showing that the proposed amendment serves to change the nature and character of the goods or services or restrict their channels of trade and customers so as to introduce a substantially different issue for trial.

*Johnson & Johnson v. Stryker Corp.*, 109 USPQ2d 1077, 1078-79 (TTAB 2013); *Drive Trademark Holdings LLC v. Inofin*, 83 USPQ2d 1433, 1435 (TTAB 2007).[83]

Applicant consented to judgment on the broader identification of goods and services and argued there was a substantially different issue for trial due to the limitation on channels of trade and customers.[84] In response, Opposer argued, inter alia, that Applicant does not meet the test for an amendment to the identification of goods and services "because the proposed change does not materially change the nature or character of the goods or services or restrict their channels of trade and customers."[85]

Based on our review of the parties' submissions and the record, we find that the first and second conditions have been satisfied: Applicant's proposed amendment is limiting within the meaning of Trademark Rule 2.71, 37 C.F.R. § 2.71, and Applicant has consented to entry of judgment as to Opposer's Section 2(d) claim as to the broader identification of goods and services. However, we find that Applicant has not made the proper showing with regard to the third requirement, which provides that

---

[83] The fourth factor relates to specimens of use to support the goods or services as amended. Because the subject application was filed pursuant to Trademark Act Section 66(a), this factor is inapplicable. *See Johnson & Johnson*, 109 USPQ at 1079 n.4.

[84] 7 TTABVUE 7-8.

[85] 9 TTABVUE 5-6.

Applicant "must set forth adequate reasons for the amendment," *see Drive Trademark Holdings*, 83 USPQ2d at 1435 (citing *See Giant Food, Inc. v. Standard Terry Mills, Inc.*, 229 USPQ 955, 963 (TTAB 1986)); in other words, that Applicant "must make a prima facie showing that the proposed amendment serves to change the nature and character of the goods or services or restrict their channels of trade and customers so as to introduce a substantially different issue for trial." *Id.*

Although Applicant's proposed amendment is narrowing, Applicant did not seek to also restrict Opposer's pleaded registrations by way of a counterclaim to partially cancel the registrations under Trademark Act Section 18 to exclude use of the marks in connection with Level 4 and Level 5 autonomous vehicles for the International Class 9 and 42 goods and services. As discussed *infra* in comparing the parties' goods and services, Opposer's pleaded registrations cover use with respect to all vehicles and do not include any limitation on the levels of automation in the description of the goods and services. As a result, the comparison of the parties' respective goods and services, channels of trade, and consumers is not changed as a result of the proposed amendment, and therefore, as it pertains to considering whether there is a likelihood of confusion between Applicant's applied-for mark and Opposer's pleaded marks, Applicant's proposed amendment does not introduce a substantially different issue for trial.

In view of the foregoing, Applicant's motion to amend is **denied**.

VI.    Entitlement to a Statutory Cause of Action

An opposer in an opposition proceeding before the Board must prove its entitlement to a statutory cause of action. *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). Section 13 of the Trademark Act, 15 U.S.C. § 1063(a), states:

> Any person who believes that he would be damaged by the registration of a mark upon the principal register, including the registration of any mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefor, within thirty days after the publication under subsection (a) of section 1062 of this title of the mark sought to be registered.

To establish entitlement to a statutory cause of action under Section 13, Opposer must demonstrate (1) that its Section 2(d) claim falls within the zone of interests protected by the statute (i.e., has a "real interest" in the outcome of the proceeding); and (2) damage proximately caused by the proposed registration (i.e., a reasonable basis for its belief in damage). *See Meenaxi Enter., Inc. v. Coca-Cola Co.*, 2022 USPQ2d 602, at *2 (Fed. Cir. 2022) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 132 (2014)); *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *4-8 (Fed. Cir. 2020); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020); *Empresa,* 111 USPQ2d at 1162.

Opposer has established its entitlement to a statutory cause of action by submitting printouts of its pleaded Registration Nos. 4340849, 5657073, 4340851,

and 5657072 from the USPTO's TSDR records with its Notice of Opposition showing the current status of and title to the registrations.[86] *See, e.g., New Era Cap Co., Inc.,* 2020 USPQ2d 10596, at \*6 (pleaded registrations establish statutory entitlement to bring opposition). Opposer also presented testimony that it has used its 3RD EYE mark in interstate commerce since at least 2004 with the goods and services identified in its pleaded registrations.[87] *See Syngenta Crop Prot. Inc. v. Bio-Chek LLC,* 90 USPQ2d 1112, 1118 (TTAB 2009) (testimony that plaintiff uses its mark "is sufficient to support [plaintiff's] allegations of a reasonable belief that it would be damaged ...."). Therefore, Opposer has demonstrated a plausible Trademark Act Section 2(d) claim against the involved application for the mark TRIPLEYE for the goods and services identified therein. *See Lipton Indus. Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

Based on this evidence, we find Opposer has an interest falling within the zone of interests protected by the statute and a reasonable belief in damage proximately caused by the proposed registration of Applicant's mark.

VII.    Trademark Act Section 2(d) Claim

We turn now to Opposer's Section 2(d) claim. Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), prohibits the registration of a mark that

> [c]onsists of or comprises a mark which so resembles a
> mark registered in the Patent and Trademark Office, or a
> mark or trade name previously used in the United States
> by another and not abandoned, as to be likely, when used

---

[86] Notice of Opposition, 1 TTABVUE 15-28.

[87] Kummer Decl. at ¶¶ 11, 23; 12 TTABVUE 4, 9.

on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

We consider each element of this claim, priority and likelihood of confusion, below.

### A. Priority

Because Opposer properly made of record its valid and subsisting pleaded registrations, and Applicant did not counterclaim to cancel Opposer's pleaded registrations, priority is not at issue for the marks and goods and services identified therein. *See King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); *Nkanginieme v. Appleton*, 2023 USPQ2d 277, at *2 (TTAB 2023) ("Opposer's registration removed priority as an issue.").

### B. Likelihood of Confusion

Our analysis is based on all of the probative evidence of record. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*") cited in *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 113 USPQ2d 2045, 2049 (2015). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In making our determination, the Board has considered each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Cap. City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination.").

"Each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde,* 475 F.2d 1197, 177 USPQ 386, 387 (CCPA 1973). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and services. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). These factors, and the other *DuPont* factors argued by each party, are discussed below.

The involved application includes two separate classes of goods and services. "Because each class in Applicant's multi-class application is, in effect, a separate application, we consider each class separately [where appropriate], and determine whether [Opposer] has shown a likelihood of confusion with respect to each." *N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1228 (TTAB 2015).

We focus our analysis on Opposer's registered standard character mark 3RD EYE in its Registration Nos. 4340849 and 5657073 because these marks are "most similar" to Applicant's standard character TRIPLEYE mark and the goods and services of the involved application are "most similar" to the goods and services identified in these registrations. *Sock It To Me, Inc. v. Aiping Fan*, 2020 USPQ2d 10611, at *6 (TTAB 2020) ("We focus on the registered mark SOCK IT TO ME (in standard characters, with 'SOCK' disclaimed) for 'socks and stockings' because it is most similar to

Applicant's mark and is registered for goods that are most similar (in fact, identical in part) to Applicant's goods."). If we find confusion likely between Applicant's applied-for mark and the 3RD EYE standard character pleaded marks, we need not consider the likelihood of confusion between Applicant's applied-for mark and Opposer's other pleaded marks, including its composite marks. On the other hand, if we find no likelihood of confusion based on the 3RD EYE mark subject to Registration Nos. 4340849 and 5657073, we would not find confusion likely based on Opposer's other pleaded marks. *See, e.g., Monster Energy Co. v. Lo*, 2023 USPQ2d 87, at *12 (TTAB 2023) (confining likelihood of confusion analysis to most similar pleaded mark) (citing *Sock It To Me*, 2020 USPQ2d 10611, at *6) (subsequent history omitted)); *See also In re Max Cap. Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010) ("Because the design element in the cited MAX and design mark arguably contains an additional point of difference with applicant's mark, we confine our analysis to the issue of likelihood of confusion between applicant's mark and the cited registration for MAX in typed drawing form.").

1.      Strength of Opposer's Registered 3RD EYE Mark

Because it affects the scope of protection to which it is entitled, we commence by addressing the strength or weakness of Opposer's registered 3RD EYE mark. "Two of the *DuPont* factors (the fifth and sixth) consider [the] strength" of a plaintiff's mark. *Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 2023 USPQ2d 737, at *3-4 (Fed. Cir. 2023). "The fifth *DuPont* factor, '[t]he fame of the prior mark (sales, advertising, length of use),' *DuPont*, 177 USPQ at 567, is a measure of the mark's strength in the

marketplace." *Id.* (citing *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733 (Fed. Cir. 2017)). This factor allows a plaintiff to expand the scope of protection its mark should be afforded based on evidence of marketplace strength.

By contrast, "the sixth *DuPont* factor '[t]he number and nature of similar marks in use on similar goods,' *DuPont*, 177 USPQ at 567, [ ] is a measure of the extent to which other marks weaken the assessed mark." *Spireon,* 2023 USPQ2d at *4 (citing *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed Cir. 2005)). This *DuPont* factor allows a defendant to contract the scope of protection of a plaintiff's mark by adducing evidence of conceptual and commercial weakness. *Spireon*, 2023 USPQ2d at *4.

The fifth and sixth factors have been argued, respectively, by Opposer and Applicant. We will first consider the conceptual and commercial strength of Opposer's mark, and we will then consider Applicant's evidence of weakness of Opposer's mark.

a)      Asserted Strength or Fame of Opposer's Mark

In determining the strength of a mark, we consider both its inherent strength, based on the nature of the mark itself, and, if there is evidence in the record of marketplace recognition of the mark, its commercial or marketplace strength. *Spireon,* 2023 USPQ2d 737, at *4 (citing *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength … and its marketplace strength ….")); *Top Tobacco, L.P. v. N.*

*Atl. Operating Co.*, 101 USPQ2d 1163, 1171-72 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength).

(1)	Conceptual Strength

Conceptual or inherent strength is a measure of a mark's distinctiveness. *Chippendales,* 96 USPQ2d at 1686. Distinctiveness is "often classified in categories of generally increasing distinctiveness[:] ... (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Because Opposer's mark is registered on the Principal Register, with no claim of acquired distinctiveness under Section 2(f), we presume it is inherently distinctive, i.e., that it is at worst suggestive of the goods. 15 U.S.C. § 1057(b) (registration is "prima facie evidence of the validity of the registered mark"); *In re Fiesta Palms, LLC*, 85 USPQ2d 1360, 1363 (TTAB 2007) (when mark is registered on the Principal Register, "we must assume that it is at least suggestive").

(2)	Fame/Commercial Strength

We next consider the fame/commercial strength of Opposer's 3RD EYE mark as argued by Opposer. Fame/commercial strength is the extent to which a significant portion of the relevant public recognizes a mark as denoting a single source. *Joseph Phelps Vineyards,* 122 USPQ2d at 1734. Here, the relevant consumers are purchasers of cameras and camera systems, including as part of vehicle surveillance, detection, and monitoring systems and services.

The fame/commercial strength of a mark is not a binary "all-or-nothing" factor. *Joseph Phelps Vineyards,* 122 USPQ2d at 1734. Rather, likelihood of confusion fame/commercial strength "varies along a spectrum from very strong to very weak." *See Palm Bay*, 73 USPQ2d at 1694 (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059 (Fed. Cir. 2003)). Famous marks "enjoy wide latitude of legal protection" and are "more attractive as targets for would-be copyists." *Id.* Fame for likelihood of confusion purposes arises as long as a "significant portion of the relevant consuming public ... recognizes the mark as a source indicator." *Id.*

A mark falling on the higher end of the fame/commercial strength spectrum has extensive public recognition and renown. *Bose Corp. v. QSC Audio Prods. Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). A high degree of fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. Because of the extreme deference that we accord a famous mark, it is the duty of the party asserting that its mark falls on the higher end of the fame/commercial strength spectrum to clearly prove it. *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1720 (Fed. Cir. 2012) (internal quotation marks and citation omitted) (citing *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007)).

Fame/commercial strength may be measured not only directly by consumer surveys or declarations but also indirectly by the volume of sales and advertising expenditures in connection with the goods or services sold under the mark, and supported by other indicia such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods or services identified by the marks; the general reputation of the goods or services; and social media presence. *Weider Publ'ns, LLC v. D & D Beauty Care Co.,* 109 USPQ2d 1347, 1354 (TTAB 2014), *appeal dismissed per stipulation*, No. 2014-1461 (Fed. Cir. Oct. 10, 2014); *see also Bose*, 63 USPQ2d at 1308 (recognizing indirect evidence as appropriate proof of strength); *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017) (finding petitioner's evidence of commercial strength included unsolicited media coverage); *ProQuest Info. and Learning Co. v. Island*, 83 USPQ2d 1351, 1358 (TTAB 2007) (finding widespread unsolicited media is probative of fame). Depending on the industry, some context in which to place raw statistics may be necessary (e.g., the substantiality of the sales or advertising figures for comparable types of products or services). *Bose*, 63 USPQ2d at 1309.

Unlike dilution fame, "[t]he proper legal standard for evaluating the fame of a mark under the fifth *DuPont* factor is the class of customers and potential customers of a product or service, and not the general public." *Joseph Phelps Vineyards,* 122 USPQ2d at 1734.

Relying on the Kummer Declaration and exhibits thereto, Opposer argues that its 3RD EYE marks "are well known, commercially strong, and entitled to a broad scope

of protection" because: (1) "3rd Eye and its predecessor in interest have exclusively and continuously offered goods and services under the 3RD EYE Marks for the past **twenty** years[;]" (2) "3rd Eye's goods and services offered under the 3RD EYE Marks have developed a reputation and strong presence in the industry and trade[;]" (3) "3rd Eye makes continuous efforts to market and promote its goods and services offered under the 3RD EYE Marks through" its website, industry conferences and exhibitions, digital and print advertisements in relevant trade publications, social media pages, press releases, marketing and point-of-sale materials, and its nationwide network of authorized dealers; (4) 3rd Eye's nationwide marketing has resulted in substantial sales; and (5) 3rd Eye has received "significant unsolicited media coverage concerning the goods and services bearing the 3RD EYE Marks."[88]

In response, Applicant argues, inter alia, that: (1) Opposer's evidence of fame/commercial strength is "provided entirely without context[;]" (2) Opposer only identified its advertising expenses associated with attending a single trade show; and (3) Opposer's evidence as a whole "falls short" of that required for proving fame/commercial strength.[89]

Opposer's testimony and evidence show that Opposer's 3RD EYE mark has been in continuous use in commerce since at least 2004 in connection with "vehicle surveillance and detection systems, and related hardware, software and software-based services" as well as the related goods and services identified in its pleaded

---

[88] Opposer's Br., 47 TTABVUE 36-37 (emphasis in original).

[89] Applicants Br., 48 TTABVUE 35-36.

registrations.[90] Opposer has presented evidence of its revenue for the sale of certain hardware between 2019 and 2022 and evidence of the cost to attend a single trade show. The revenue from the hardware sales has been designated as confidential,[91] and so we can only discuss these figures in general terms.[92] Without some context in which to place raw statistics, for example, market share or sales or advertising figures for comparable types of goods, the significance of the raw numbers is difficult to assess. *See Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1690-91 (Fed. Cir. 2018) (citing *Bose Corp.*, 63 USPQ2d at 1309); *See also Fossil Inc. v. Fossil Grp.*, 49 USPQ2d 1451, 1457 (TTAB 1998) ("Raw sales and advertising figures unless they are extraordinarily large, which is not the case with opposer's FOSSIL products are simply not sufficient by themselves to establish that the mark is famous."). Thus, we can only speculate as to what Opposer's revenues mean vis-à-vis its competitors.

Opposer also produced evidence concerning its presence on various social media platforms, including Facebook, LinkedIn, YouTube, and Twitter.[93] While Opposer maintains a social media presence, Opposer did not provide any testimony regarding the number of people that "follow" Opposer on its social media accounts or how its

---

[90] Kummer Decl. at ¶ 11, 12 TTABVUE 4.

[91] Kummer Decl. ¶¶ 19, 27, 11 TTABVUE (confidential).

[92] As discussed *supra* at pp. 13-18, we have not considered the expanded identification of hardware sales (or software sales or subscription counts) listed in OTX 33, as OTX 33 has received no consideration under the estoppel sanction. We have, however, considered Opposer's hardware sales that are identified in the Kummer Declaration.

[93] Kummer Decl. at ¶ 29, 12 TTABVUE 10; *see also* OTX 11 to Kummer Decl., 12 TTABVUE 435-527 (screenshots printed from Opposer's social media pages).

number of followers compare to others in its industry.[94] Inasmuch as it is de rigueur for businesses to have a social media presence, Opposer's limited evidence is not probative, in and of itself, of the fame/commercial strength of Opposer's 3RD EYE mark. *Cf. In re White Jasmine LLC*, 106 USPQ2d 1385, 1396 (TTAB 2013) (In finding evidence of acquired distinctiveness insufficient, "Applicant states that it advertises its WHITE JASMINE teas and spices on its website, but applicant fails to indicate how many visitors its website attracts.").

Mr. Kummer further testified that "Opposer has been the subject of unsolicited media and trade articles discussing its goods and services offered under the 3RD EYE Marks."[95] Upon close review of the record, we observe that Opposer has made of record only three instances of unsolicited media recognition: (1) a "Product Spotlight" in Waste Today;[96] (2) an article concerning Environmental Solutions Group's acquisition of Opposer's predecessor in interest, Alliance Wireless Technologies in Waste 360;[97] and (3) an article concerning the addition of "3rd Eye vehicle data suite" to the operations of Leck Waster Services in Recycling Today.[98]

Ultimately, with only three media articles (which shows no more than minimal evidence of unsolicited media recognition), the absence of proof of a strong social

---

[94] In any event, the number of followers and likes shown on the face of the social media exhibits appear underwhelming. *See* OTX 11 to Kummer Decl., 12 TTABVUE 435-527 (screenshots printed from Opposer's social media pages).

[95] Kummer Decl. at ¶ 30, 12 TTABVUE 10.

[96] OTX 12 to Kummer Decl., 12 TTABVUE 529-530.

[97] *Id.* at 531-32.

[98] *Id.* at 534-38.

media presence, and no context for gauging Opposer's revenues and advertising expenditures in the vehicle surveillance and detection system industry, we cannot place Opposer's 3RD EYE mark on the high end of the fame/commercial strength spectrum amongst a "significant portion of the relevant U.S. consumers" in the vehicle surveillance and detection system industry. *Palm Bay*, 73 USPQ2d at 1694. Perhaps on a more developed record we would find otherwise. As a result, the fifth *DuPont* factor is neutral.

b)      Asserted Weakness of Opposer's Mark

We now address whether the scope of protection of Opposer's 3RD EYE mark is limited under the sixth *DuPont* factor as argued by Applicant. *Spireon,* 2023 USPQ2d at *4 (citing *DuPont*, 117 USPQ at 557) (the sixth *DuPont* factor "is a measure of the extent to which other marks weaken the assessed mark"). As noted above, "the strength of a mark is not a binary factor" and "varies along a spectrum from very strong to very weak." *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675-76 (Fed. Cir. 2015) (internal citations omitted). "The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *Id*. at 1676 (internal citations omitted). The purpose of introducing evidence of third-party marketplace use is "to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different [such] marks on the bases of minute distinctions.'" *Omaha Steaks Int'l, Inc.,* 128 USPQ2d at 1693 (quoting *Palm Bay,* 73 USPQ2d at

1694). *Accord Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.,* 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *Juice Generation,* 115 USPQ2d at 1674. "Extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established." *Jack Wolfskin*, 116 USPQ2d at 1136 (quoting *Juice Generation,* 115 USPQ2d at 1674). *Accord Spireon*, 2023 USPQ2d at *5-6.

(1)     Third-Party Registration Evidence

In considering the sixth *DuPont* factor, we first address Applicant's third-party registration evidence. Properly made of record, third-party registrations may be relevant "to prove that some segment of the [mark] has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Juice Generation,* 115 USPQ2d at 1675 (internal citation quotation marks omitted); *see also Spireon*, 2023 USPQ2d at *4-5; *Jack Wolfskin*, 116 USPQ2d at 1136. Even if "there is no evidence of actual use" of "third-party registrations," such registrations "may be given some weight to show the meaning of a mark in the same way that dictionaries are used." *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693, 694-95 (CCPA 1976).

Applicant submitted the following thirty-five third-party trademark registrations for EYE-formative marks, which Applicant summarized in the chart below, to demonstrate the alleged "weakness of 3rd Eye's 3RD EYE marks and the number of similar marks with similar goods/services:"[99]

---

[99] Applicant's Second NOR, 36 TTABVUE 2-236. In its Second Notice of Reliance, Applicant includes a chart identifying third-party registrations for which it "intends to offer and rely

|     | Mark | Registration No. |
| --- | --- | --- |
| i | CAD EYE | 6641824 |
| ii | CUBE EYE (design) | 5759976 |
| iii | DUAL EYE | 5754802 |
| iv | E-EYE | 5190760 |
| v | EYE-PAL SOLO | 4797883 |
| vi | EYE RANG | 6678426 |
| vii | EYE-PAL | 3949899 |
| viii | FALCON EYE | 6187912 |
| vix | FLEX-EYE | 6541645 |
| X | FLUID EYE | 5929199 |
| xi | FROM EYE TO INSIGHT | 5016225 |
| xii | GEN-EYE | 2304571 |
| xiii | HAWK EYE SURVEILLANCE | 5671469 |
| xiv | HAWK EYE | 3494052 |
| xv | HOOK EYE (& design) | 5190761 |
| xvi | HOOK EYE | 4827801 |
| xvii | INNO-EYE | 5010977 |
| xviii | MECH-EYE | 6527458 |
| xix | MINI ADVANCED CAR EYE | 5874617 |
| xx | MIRROREYE | 5757922 |

upon." *Id.* at 2-4. We include a screen capture of that chart, without the "Production No." column, which identified the Bates number for the third-party registrations.

| xxi | MORE THAN MEETS THE EYE | 6036614 |
|---|---|---|
| xxii | MOTION EYE | 5697913 |
| xxiii | MY EXTRA EYE | 5570352 |
| xxiv | MYNT EYE | 5890152 |
| xxv | PIXEL EYES | 4653372 |
| xxvi | PLAYSTATION EYE | 3653110 |
| xxvii | RAVEN EYE ON THE FUTURE REMOTE AUDIO VIDEO EVENT NOTIFICATION | 5184266 |
| xxviii | RV-EYE | 5043732 |
| xxix | STICKER-EYE | 5648651 |
| xxx | SURGIC EYE | 3991702 |
| xxxi | THE EYES TO THE SMART HOME | 6216915 |
| xxxii | TRAILER EYES | 3574397 |
| xxxiii | TRIEYE | 5809270 |
| xxxiv | WALL-EYE | 4746394 |
| Xxxv | XPERT EYE | 5352508 |

In Opposer's brief, Opposer criticizes Applicant's reliance on several of the third-party registrations because they are either based on Trademark Act Sections 44(e) or 66(a) and have been registered for less than five years or they have been canceled, namely Registration Nos. 6641824, 5759976, 5754802, 6187912, 6541645, 5929199, 5809270, 5190760, 5190761.[100] Opposer also criticizes the Internet evidence allegedly

---

[100] Opposer's Br., 47 TTABVUE 39-42.

showing use of these same marks, including, for example, because the Internet evidence does not show use of certain marks at all, the goods and services in connection with which certain marks are used are unrelated to those at issue in this proceeding, and there is no indication for certain marks that the marks have been used in the United States. *Id.* at 39-48. In its brief, Applicant does not rely on these registrations or alleged uses of the marks subject to these registrations.[101]

We have not considered the third-party registrations that are not based on Section 1(a). *See Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at \*11 (TTAB 2022) ("third-party registrations that are not based on use in commerce; but rather issued under Trademark Act Sections 44(e) or 66(a), 15 U.S.C. §§ 1126(e) or 1141f(a), based on the foreign trademark owners' home country registrations or as extensions of protection to the United States based on an international registration -- and have been registered for less than five years … lack probative value, and we have not considered them"). Likewise, we have not considered the Internet evidence from foreign websites because we cannot ascertain the extent of exposure to U.S. consumers on the record before us. *Cf. In re Canine Caviar Pet Foods, Inc.*, 126 USPQ2d 1590, 1596 (TTAB 2018) ("While evidence of foreign use may in some cases be probative, in this case it does not serve to tell us the norms specific to pet owners in the United States, who are the relevant consumers.").

---

[101] Applicant's Br., 48 TTABVUE 38 n.6 ("Applicant is withdrawing any reliance of cancelled registrations and registrations based on foreign registrations that have not been registered for more than five years.").

In its brief, of the thirty-five third-party trademark registrations, Applicant focuses on fifteen of them, including the following eleven registrations "for EYE-formative [marks] that recite the broad category of 'cameras'":[102]

- Registration No. 6678426 for the mark **EYE RANG** for "Cameras; Digital cameras; Digital video cameras; Photographic cameras; Video cameras" in International Class 9;[103]

- Registration No. 3949899 for the standard character mark EYE-PAL for, inter alia, "Digital cameras" in International Class 9;[104]

- Registration No. 5016225 for the standard character mark FROM EYE TO INSIGHT for, inter alia, "digital cameras" and "analog cameras" in International Class 9;[105]

- Registration No. 3494052 for the standard character mark HAWK EYE for, inter alia, "Apparatus for monitoring the actual path of a ball and extrapolating that path to predict the future path of the ball, namely, tracking equipment, namely, cameras" in International Class 9;[106]

- Registration No. 4827801 for the standard character mark HOOK EYE for "cameras" in International Class 9;[107]

- Registration No. 5010977 for the mark **inno-eye** for, inter alia, "Cameras, namely, multiple purpose cameras, digital cameras for industrial use, Cameras for inspectors for industrial purposes, Surveillance cameras" in International Class 9;[108]

---

[102] Applicant's Br., 48 TTABVUE 38.

[103] Applicant's Second NOR, 36 TTABVUE 40-44.

[104] *Id.* at 45-52.

[105] *Id.* at 72-78.

[106] *Id.* at 90-94.

[107] *Id.* at 101-106.

[108] *Id.* at 107-112.

- Registration No. 6527458 for the standard character mark MECH-EYE for, inter alia, "Cameras" and "Digital cameras for industrial use" in International Class 9;[109]

- Registration No. 5570352 for the mark for, inter alia, "Cameras; Closed circuit TV systems for security and surveillance, namely, cameras …; Computer cameras; Digital camera accessory in the nature of a digital photo viewer; Digital cameras; Digital video cameras; … Multiple purpose cameras" in International Class 9;[110]

- Registration No. 5648651 for the standard character mark STICKER-EYE for, inter alia, "Photographic cameras" in International Class 9;[111]

- Registration No. 4746394 for the standard character mark WALL-EYE for, inter alia, "cameras" in International Class 9;[112] and

- Registration No. 5352508 for the standard character mark XPERT EYE for, inter alia, "Videoconferencing terminals, namely … wearable cameras, wearable video cameras" in International Class 9.[113]

Applicant also emphasizes the following four registrations, which Applicant asserts involve "vehicle applications":

- Registration No. 5874617 for the standard character mark MINI ADVANCED CAR EYE ("ADVANCED CAR" disclaimed) for "Cameras; apparatus for recording, transmission and reproduction of data" in International Class 9;[114]

- Registration No. 5757922 for the standard character mark MIRROREYE for "Integrated camera and display system comprising video cameras, display screens for viewing, and computer software for use in replacing and improving upon vehicle exterior rear view mirrors by increasing the driver's field of vision

---

[109] *Id.* at 113-117.

[110] *Id.* at 143-147.

[111] *Id.* at 183-187.

[112] *Id.* at 220-228.

[113] *Id.* at 229-236.

[114] *Id.* at 118-124.

in a wide variety of driving conditions including enhancing night vision and including the ability to record" in International Class 9;[115]

- Registration No. 6036614 for the standard character mark MORE THAN MEETS THE EYE for "Downloadable or recorded computer application software and downloadable or recorded embedded computer software for use in security systems, video management systems, cameras, network cameras, camera software, video software featuring event detection, object recognition, 3D pose estimation, and motion estimation" in International Class 9;[116] and

- Registration No. 5043732 for the standard character mark RV-EYE for "Dashboard cameras; Infrared cameras; Rearview cameras for vehicles; Remote video monitoring system consisting primarily of a camera and video monitor for recording and transmitting images to a remote location; Safety and driving assistant system for mobile vehicles and vessels comprised of electronic proximity sensors and switches, high-resolution cameras, integrated circuits for the purpose of imaging processing, and display monitors; Vehicle safety equipment, namely, an on-board vehicular surveillance system comprised of cameras and monitors for exposing and eliminating the blind spots on both sides of the vehicle; Vehicle safety equipment, namely, back-up sensors and cameras" in International Class 9.[117]

Applicant argues that these fifteen third-party registrations "are highly relevant evidence of third party use of EYE-formative marks on similar goods, and demonstrate the weakness of the only common feature in Applicant's and Opposer's Marks" (i.e., the term "EYE") and that "these third party uses suggest that consumers have been educated to understand that the EYE-formative marks all have a well-understood meaning as being suggestive of cameras, further suggesting the conclusion that the EYE portion of the marks is relatively weak."[118]

---

[115] *Id.* at 125-131.

[116] *Id.* at 132-136. We note that Registration No. 6036614 does not itself include cameras but rather cameras are used in connection with the identified software.

[117] *Id.* at 173-182.

[118] Applicant's Br., 48 TTABVUE 40.

In its rebuttal brief, Opposer argues, inter alia, that (1) "Applicant's discussion of the third-party registrations lacks context about the actual use of those marks in the marketplace[;]" (2) "Applicant's registration evidence does not show that 'customers have been educated to distinguish between different marks on the basis of minute distinctions[;]" and (3) "Applicant fails to address Opposer's arguments that the parties' 3RD EYE Marks and TRIPLEYE Mark are significantly more similar to each other than any of the referenced third-party registrations."[119]

Because each of the above-identified third-party registrations cover "cameras" or use in connection with "cameras," including four registrations for which cameras, or the use of cameras, are involved with vehicle applications, these registrations are relevant to at least the involved International Class 9 goods. *See Omaha Steaks Int'l*, 128 USPQ2d at 1694 (the "controlling inquiry is the extent of third-party marks in use on 'similar' goods or services.").

Moreover, although Applicant did not focus on the registrations identified below in its brief, we note that Applicant also submitted into evidence, and did not withdraw, the following:

- Registration No. 4797883 for the standard character mark EYE-PAL SOLO for "Digital cameras specially adapted for use in photographing text and converting the visual text to audio format for use by the visually impaired; Digital input and output scanners; Electronic book reader; Optical character readers; Optical character recognition apparatus" in International Class 9;[120]

---

[119] Opposer's Rebuttal Br. 18-19 (citations omitted).

[120] Applicant's Second NOR, 36 TTABVUE 33-39.

- Registration No. 2304571 for GEN-EYE, in typeset form,[121] for "video inspection system for use in pipe and conduits, comprised of video camera, cable, video display, and position locator" in International Class 9;[122]

- Registration No. 5671469 for the standard character mark HAWK EYE SURVEILLANCE ("SURVEILLANCE" disclaimed) for "Camera hardware systems for IP (Internet protocol) video surveillance; computer hardware for IP video surveillance; electric and electronic video surveillance installations; electronic video surveillance products, namely, electronic components of security systems" in International Class 9;[123]

- Registration No. 5697913 for the standard character mark MOTION EYE ("MOTION" disclaimed) for "a camera sold as an integral component of finished smartphones and mobile phones" in International Class 9;[124]

- Registration No. 5890152 for the standard character mark MYNT EYE for "3D camera systems, namely, adapters for allowing 3D shooting" in International Class 9;[125]

- Registration No. 4653372 for the standard character mark PIXEL EYES ("PIXEL" disclaimed) for "Mobile telephones; personal digital assistants; digital still cameras; camcorders; personal computers; global positioning systems for automobile use; liquid crystal displays; portable digital audio and video players" in International Class 9;[126]

- Registration No. 3653110 for the standard character mark PLAYSTATION EYE for "video cameras; cameras for use with a computer game console" in International Class 9;[127]

- Registration No. 5184266 for the mark ("REMOTE AUDIO VIDEO EVENT NOTIFICATION" disclaimed) for,

---

[121] Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed or typeset mark is the legal equivalent of a standard character mark. *See In re Viterra, Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012).

[122] Applicant's Second NOR, 36 TTABVUE 79-84.

[123] *Id.* at 85-89.

[124] *Id.* at 137-42.

[125] *Id.* at 148-52.

[126] *Id.* at 153-58.

[127] *Id.* at 159-64.

inter alia, "Alarm monitoring systems; burglar alarms; building security systems comprising software and hardware for providing picture, video, alarm status, building plans, and other information to a remote location; closed circuit television systems for security and surveillance comprised of cameras, switchers, monitors, microphones and recorders; computer software that provides web-based access to applications and services through a web operating system or portal interface; day and night vision systems comprised of day and night sensors, day and night cameras, power sources, communication means, monitors and operating software; digital cameras for industrial use; digital video cameras; downloadable software in the nature of a mobile application for remote video surveillance and for video monitoring and security; all of the foregoing only for residential use and use in commercial applications in the nature of commercial buildings and for the food service, convenience store, and retailer industries" in International Class 9;[128]

- Registration No. 3991702 for the standard character mark SURGIC EYE for, inter alia, "calculating machines, data-processing equipment and computers; computer software and hardware for use in medical technology for image generation, data processing, data documentation in the nature of creation of reports, logs, static images, videos, sound recordings and signal recordings, as well as for data visualization in the nature of computer renders, fused visualizations, multiplanar visualizations, virtual reality visualizations, augmented reality visualizations, projection images and videos, acoustic displays, haptic displays and temperature displays; pre-operative, intra-operative and post-operative software and hardware for use in the medical field for image generation, data processing, data documentation in the nature of creation of reports, logs, static images, videos, sound recordings and signal recordings, as well as for data visualization in the nature of computer renders, fused visualizations, multiplanar visualizations, virtual reality visualizations, augmented reality visualizations, projection images and videos, acoustic displays, haptic displays and temperature displays; imaging 3D software and hardware for use in the medical field for image generation, data processing, data documentation in the nature of creation of reports, logs, static images, videos, sound recordings and signal recordings, as well as for data visualization in the nature of computer renders, fused visualizations, multiplanar visualizations, virtual reality visualizations, augmented reality visualizations, projection images and videos, acoustic displays, haptic displays and temperature displays" in International Class 9;[129]

---

[128] *Id.* at 165-72.

[129] *Id.* at 188-99.

- Registration No. 6216915 for the standard character mark THE EYES TO THE SMART HOME for "Electric doorbells and home automation systems comprised of microphones, speakers, cameras, lights, and software therefore" in International Class 9;[130] and

- Registration No. 3574397 for the standard character mark TRAILER EYES ("TRAILER" disclaimed) for "Trailer interior monitoring system composed of wireless cameras, color screen monitors, antennas, power supply connectors and adaptors for use with portable electronic devices, and mounting devices for cameras and monitors" in International Class 9.[131]

The fifteen third-party registrations on which Applicant focuses its attention, and the additional eleven registrations that Applicant submitted but did not discuss in its brief, show that the shared term "EYE" is a common element of marks in connection with "cameras." *See Spireon*, 2023 USPQ2d 737, at *4-5 ("third-party registrations containing an element that is common to both the opposer's and the applicant's marks can show that that element has 'a normally understood and well-recognized descriptive or suggestive meaning'") (quoting *Jack Wolfskin*, 116 USPQ2d at 1136); *see also* 2 J. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:90 (5th ed. May 2024 Update) ("[Third-party] registrations could also show that the PTO, by registering several marks with such a common segment, recognizes that portions of such composite marks other than the common segment are sufficient to distinguish the marks as a whole and to make confusion unlikely.").

However, none of the third-party registered marks incorporate the entirety of Opposer's 3RD EYE mark, and none of the third-party registered marks are similar to Opposer's mark as a whole. None consist of a formative of the word "eye" combined

---

[130] *Id.* at 200-08.

[131] *Id.* at 209-13.

with any number. Rather, each registration consists of marks with entirely different terms with a completely different appearance, pronunciation and meaning. *See Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, at \*9-10 (TTAB 2021) ("[W]hile the registered marks all contain the word 'MIRAGE,' they contain additional elements that cause many of them to be less similar to Petitioner's mark …."); *see also Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 223 USPQ 1281, 1284-85 (Fed. Cir. 1984) ("Applicant introduced evidence of eight third-party registrations for tea which contain the word 'SPICE', five of which are shown to be in use. None of these marks has a 'SPICE (place)' format or conveys a commercial impression similar to that projected by the SPICE ISLANDS mark, and these third-party registrations are of significantly greater difference from SPICE VALLEY and SPICE ISLANDS than either of these two marks from each other.").

(2)     Third-Party Use Evidence

Applicant also introduced a single webpage printout corresponding to each of the thirty-five third-party registrations, purporting to show use of each such mark.[132] Applicant submitted this Internet evidence to establish diminished commercial or marketplace strength of Opposer's mark.[133] *See Spireon*, 2023 USPQ2d 737, at \*4 ("[t]he number and nature of similar marks in use on similar goods … is a measure of the extent to which other marks weaken the assessed mark.") (internal citation and quotation marks omitted); *Palm Bay Imps.*, 73 USPQ2d at 1693 ("Evidence of

---

[132] Applicant's Third NOR, 37 TTABVUE 38-268.

[133] Applicant's Br., 48 TTABVUE 36-40.

third-party use of similar marks on similar goods [or services] is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection."); *see also Jack Wolfskin*, 116 USPQ2d at 1136; *Juice Generation*, 115 USPQ2d at 1675-76 (internal citations omitted).

The third-party marketplace uses suffer the same limitation as the third-party registration evidence because while the marks include EYE, none of the marks are similar to Opposer's mark overall.

### c)     Conclusion

Opposer has not demonstrated that its mark is on the high end of the fame/commercial strength spectrum amongst a "significant portion of the relevant U.S. consumers" in the vehicle surveillance and detection system industry under the fifth *DuPont* factor. In view thereof, we find that the fifth *DuPont* factor is neutral.

Under the sixth *DuPont* factor, the evidence of third-party marks reflects weakness of the word EYE but not of Opposer's mark as a whole. However, consumers apparently distinguish among coexisting EYE-formative marks based on other elements, and EYE is the only shared component of Opposer's and Applicant's marks. The sixth *DuPont* factor thus weighs against likely confusion.

### 2.     The Marks

We now consider the first *DuPont* factor, which involves an analysis of the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay,* 73 USPQ2d at 1692 (citing *DuPont*, 177 USPQ at 567). "[T]he 'similarity or dissimilarity of the marks in their

entireties' is a predominant inquiry." *Herbko Int'l, Inc. v. Kappa Books, Inc,* 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002) (citing *DuPont,* 476 F.2d at 1361).

The proper test regarding similarity "is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (quoting *Coach Servs.,* 101 USPQ2d at 1721 (internal quotation marks and citation omitted)). Further, the marks "must be considered ... in light of the fallibility of memory ...." *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (quotation omitted). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *In re Bay State Brewing Co., Inc.*, 117 USPQ2d 1958, 1960 (TTAB 2016) (citing *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991)), *aff'd per curiam*, 972 F.2d 1353 (Fed. Cir. 1992); *see also In re Binion*, 93 USPQ2d 1531, 1534 (TTAB 2009). "Similarity is not a binary factor but is a matter of degree." *St. Helena Hosp.*, 113 USPQ2d at 1085 (quoting *Coors Brewing Co.*, 68 USPQ2d at 1062)).

The similarity or dissimilarity of the marks is determined based on the marks in their entireties, not just part of the marks. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *In re Nat'l Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). *See also Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic

that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). "No element of a mark is ignored simply because it is less dominant, or would not have trademark significance if used alone." *In re Electrolyte Labs. Inc.*, 913 F.2d 930, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990) (citing *Spice Islands, Inc. v. Frank Tea & Spice Co.*, 505 F.2d 1293, 184 USPQ 35 (CCPA 1974)). "On the other hand, in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable." *In re Nat'l Data Corp.,* 224 USPQ at 751.

We now compare Opposer's standard character registered mark 3RD EYE with Applicant's standard character applied-for mark TRIPLEYE. The marks share the term "eye." However, Opposer's mark is two terms, each of which is one syllable, and Applicant's mark is a single term of three syllables.[134] "[I]t is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered." *Presto Prods. Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988); *see also In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018) ("The identity of the marks' initial two words is particularly

---

[134] Applicant's First NOR, 35 TTABVUE 82-83 (Opposer's Response to Request for Admission Nos. 27, 28, 32, 33) (Opposer admitting that "Applicant's mark TRIPLEYE is a single composite word comprised of two separate words, 'TRIPLE' and 'EYE'," "Opposer's mark 3RD EYE consists of two words," "Applicant's mark TRIPLEYE consists of three syllables," and "Opposer's mark 3RD EYE consists of two syllables.").

significant because consumers typically notice those words first."). Here, the first part of each mark is different in at least sound and appearance: TRIPLE and THIRD. As admitted by Opposer, Applicant's mark "is different in sound when pronounced than Opposer's mark 3RD EYE, but for the sound of the common element 'EYE' in the marks," and "the first portion of Applicant's mark TRIPLEYE, 'TRIPL', is different in appearance from the first portion of Opposer's mark 3RD EYE, '3RD'."[135] In view thereof, we find that they look and sound different overall.

As for connotation, Opposer introduced into the record definitions of the terms "third" and "triple." The parties agree that the following definitions apply to the terms "third" and "triple":[136] The term "3RD" (or "third") can mean, inter alia: (1) "one that is number three in a series;" (2) "one of three equal parts of something;" or (3) "[t]he ordinal number matching the number three in a series."[137] The term "TRIPLE" can mean, inter alia: (1) "a combination, group, or series of three;" (2) "having or involving three units or members;" or (3) "consisting of three things or parts."[138] See *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 2020 USPQ2d 10341, at *4 (Fed. Cir. 2020) (finding Board's reliance on dictionary definitions of the relevant terms in the marks and on the "marks themselves" to be substantial evidence on

---

[135] Applicant's First NOR, 35 TTABVUE 80 (Opposer's Response to Request for Admission Nos. 21 and 22).

[136] Opposer's Br., 47 TTABVUE 27; Applicant's Br., 48 TTABVUE 20.

[137] Opposer's Fifth NOR, 19 TTABVUE 53-68 (definitions of "third" from Merriam-Webster online dictionary, American Heritage online dictionary, and Collins online dictionary).

[138] Opposer's Fifth NOR, 19 TTABVUE 69-84 definitions of "triple" from Merriam-Webster online dictionary, American Heritage online dictionary, and Collins online dictionary).

which to evaluate similarities in the connotation of each mark). Opposer argues that, "[t]aken together and considered in the context of the parties' goods and services, both marks connote three cameras or 'eyes.'"[139]

In response, Applicant argues, inter alia, that: (1) the term "third" refers to "one" part in a series of "three," whereas "triple" refers to all "three" parts;[140] (2) this meaning is supported by the design depicted in Opposer's Registration Nos. 4340851 and 5657072 (and as used by Opposer in the marketplace), wherein only a single eye is depicted: ;[141] (3) the term "3RD EYE" as a whole has a "a particular mystical connotation," as explained in the Wikipedia webpage for the term "Third Eye": "The third eye (also called the mind's eye or inner eye) is a mystical invisible eye, usually depicted as located on the forehead, which provides perception beyond ordinary sight;"[142] (4) TRIPLEYE, in contrast, "clearly connotes 'three eyes'" (i.e., three cameras);[143] and (5) the commercial impression of Opposer's mark is reinforced by Opposer's marketing materials and witness testimony, wherein it is evident that the mark 3RD EYE is intended to refer to "a third eye to support the two eyes of the driver."[144]

---

[139] Opposer's Br., 47 TTABVUE 27.

[140] Applicant's Br., 48 TTABVUE 20-21.

[141] Id.

[142] Applicant's Third NOR, 37 TTABVUE 33-37.

[143] Applicant's Br., 48 TTABVUE 23.

[144] Id.

Having considered the parties arguments and evidence, we find that the marks TRIPLEYE and 3RD EYE convey different connotations and commercial impressions. TRIPLEYE has a meaning of "three eyes," suggesting three cameras in this context, whereas 3RD EYE, as a phrase, has a specific understood meaning and connotation and will be viewed as a unitary mark, calling to mind an additional eye that provides extra-ordinary perception, including for example the "mind's eye" or "inner eye."[145] Opposer asks us to take too far a leap by ignoring the understood meaning of the phrase "third eye." These differing connotations and commercial impressions are consistent with distinctions between the parties' goods, as indicated by the record.

Applicant introduced evidence that its technology is premised on a "tripled camera system."[146] Opposer, on the other hand, repeatedly markets its goods and services with the following phrase: "Let[] the Drivers Drive" and "We'll handle the rest."[147] This marketing suggests that Opposer's system and service is the "third eye," over and above the driver's two eyes. Indeed, Opposer's system of cameras and software is not based on a three-camera system; it is designed to work with up to eight cameras.[148] Furthermore, Opposer's composite mark conveys the impression of a single eye, not three eyes.[149] This all reinforces that the phrase "third eye" will be

---

[145] Applicant's Third NOR, 37 TTABVUE 33-37 (Wikipedia webpage for the term "Third Eye": "The third eye (also called the mind's eye or inner eye) is a mystical invisible eye, usually depicted as located on the forehead, which provides perception beyond ordinary sight").

[146] Dubuisson Decl. at ¶ 9, 33 TTABVUE 4-5.

[147] *See, e.g.*, OTX 11 to Kummer Decl., 12 TTABVUE 438, 441, 457, 463, 496, 497 (screenshots of Opposer's Social Media pages).

[148] *See, e.g.*, OTX 1 to Kummer Decl., 12 TTABVUE 18 (screenshot of Opposer's website).

[149] Kummer Cross-Exam. Tr. at 23:9-20, 41 TTABVUE 24.

viewed as a unitary mark, whereby Opposer's collective system, including cameras, sensors, and software, serves as the proverbial "third eye" for the consumer that purchased the system (i.e., the collective system provides "perception beyond ordinary sight" for the purchaser of the system). Taking into account the appropriate degree of strength of Opposer's mark, including the weakness of the only shared component with Applicant's mark ("EYE"), we find that, in view of these differences in connotation and commercial impression, along with the differences in sight and sound, the marks are more dissimilar than similar.

In view thereof, the first *DuPont* factor weighs against likelihood of confusion.

### 3. The Goods and Services

The second *DuPont* factor "considers whether the consuming public may perceive the respective goods or services of the parties as related enough to cause confusion about the source or origin of the goods or services." *Naterra Int'l, Inc. v. Bensalem*, 92 F.4th 1113, 2024 USPQ2d 293 at *2 (Fed. Cir. 2024) (quoting *In re St. Helena Hosp.*, 774 F.3d 747, 752 (Fed. Cir. 2014) (cleaned up) (citation omitted)). We compare the goods or services as they are identified in the involved application and Opposer's registrations. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1050 (Fed. Cir. 2018); *Stone Lion*, 110 USPQ2d at 1161; *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002). *See also B&B Hardware,* 113 USPQ2d at 2049 (recognizing that an "applicant's right to register must be made on the basis of the goods described in the application").

The goods or services need not be identical or even competitive to find a likelihood of confusion. *On-line Careline Inc. v. Am. Online Inc.,* 229 F.3d 1080, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot,* 54 USPQ2d at 1898. They need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [the goods] emanate from the same source." *Coach Servs.,* 101 USPQ2d at 1722 (quoting *7-Eleven Inc. v. Wechsler,* 83 USPQ2d 1715, 1724 (TTAB 2007)).

Opposer need not prove, and we need not find, similarity as to each good or service listed in the pleaded registrations or challenged application. "It is sufficient for finding a likelihood of confusion if relatedness is established for any item encompassed by the identification of within a particular class in the application." *In re Aquamar, Inc.,* 115 USPQ2d 1122, 1126 n.5 (TTAB 2015); *see also Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981). As stated in its brief, "Applicant concedes that there is some overlap in Applicant's unamended listing of goods and services and the listing of goods and services in Opposer's registrations."[150] We agree.

a) Applicant's International Class 9 Goods

The International Class 9 goods in Applicant's application include, inter alia, "cameras," "digital cameras" and "cameras for vehicles." The International Class 9 goods identified in Opposer's Registration No. 4340849 include, inter alia, "cameras; photographic cameras" and "vehicle detection equipment, namely, … video cameras."

[150] Applicant's Br., 48 TTABVUE 25.

As such, the International Class 9 goods in Applicant's application and Opposer's Registration No. 4340849 are in-part identical.

The second *DuPont* factor therefore favors a likelihood of confusion for Applicant's International Class 9 goods.

        b)        Applicant's International Class 42 Services

Applicant's International Class 42 services are identified as follows (emphasis added):

> Technical service in the field of design and development of computer software for production testing, maintenance and monitoring of industrial installations, as well as design and development of calibration systems, namely, initial calibration, recalibration and continuous calibration in the nature of steering apparatus for vehicles, and related consultancy services; technical project planning services, design services, consulting services in relation to the aforementioned services, **technological services relating to design, namely, project planning and design engineering of apparatus and instruments for controlling and monitoring vehicles, of industrial automation controls, of industrial automation software, of vehicle control assistance software, of hardware for electronic driving assistance systems and of on-board electronic systems for providing driving assistance**; software design and development; design of motor vehicles; installation and implementation of computer software; maintenance and updating of computer software; technological research relating to computers; engineering services relating to robotics; development of computer systems for the processing of data.

The International Class 9 goods identified in Opposer's Registration Nos. 4340849 and 5657073 include "vehicle detection equipment, namely, … application software to detect vehicle location," and the International Class 9 goods identified in Opposer's Registration No. 5657073 also includes "downloadable software in the nature of a

mobile application for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicle safety and operational systems."

The identification of goods or services may in itself constitute evidence of the relatedness of the goods or services. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 1267, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (finding the Board erred in concluding that there was insufficient evidence of relatedness, because it "did not consider the important evidence already before it, namely the ITU application and [opposer's] registrations"). Given the plain meaning of the wording in the identifications, we find Applicant's Class 42 services and Opposer's Class 9 software are closely related.[151] Applicant's Class 42 services cover the design of software that performs the identical purpose or function of Opposer's software (i.e., controlling and monitoring vehicles). Thus, consumers can seek out Applicant's services, or purchase Opposer's software, to accomplish the same purpose.

The second *DuPont* factor therefore favors a likelihood of confusion for Applicant's International Class 42 services.

4.      The Established, Likely-to-Continue Channels of Trade, Classes of Consumers, and Purchasing Conditions

This brings us next to the third *DuPont* factor, the established, likely-to-continue channels of trade and classes of consumers, *see Detroit Athletic Co.,* 128 USPQ2d at 1051 (citing *DuPont*, 177 USPQ at 567), and the fourth *DuPont* factor, "'[t]he

---

[151] The classification of goods and services by the USPTO is a purely administrative determination and is irrelevant to whether the involved goods and services are related. *Detroit Athletic*, 128 USPQ2d at 1051 ("Classification is solely for the 'convenience of Patent and Trademark Office administration,' and 'is wholly irrelevant to the issue of [likelihood of confusion].'").

conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing.'" *Stone Lion,* 110 USPQ2d at 1162 (quoting *DuPont*, 177 USPQ at 567). A heightened degree of care when making a purchasing decision may tend to minimize likelihood of confusion. *See, e.g., In re N.A.D., Inc.,* 754 F.2d 996, 224 USPQ 969, 971 (Fed. Cir. 1985) (because only sophisticated purchasers exercising great care would purchase the relevant goods, there would be no likelihood of confusion merely because of the similarity between the marks NARCO and NARKOMED). Conversely, impulse purchases of inexpensive items may tend to have the opposite effect. *Palm Bay*, 73 USPQ2d at 1695. As with the second *DuPont* factor, we look to the language of the identifications to ascertain the trade channels, classes of consumers, and degree of care in purchasing. *See Stone Lion*, 110 USPQ2d at 1161-63 ("Even assuming there is no overlap between Stone Lion's and Lion's current customers, the Board correctly declined to look beyond the application and registered marks at issue. An application with 'no restriction on trade channels' cannot be 'narrowed by testimony that the applicant's use is, in fact, restricted to a particular class of purchasers.'") (quoting *Octocom Sys.*, 16 USPQ2d 1788).

a) International Class 9 Goods

Because the International Class 9 goods in Applicant's application and Opposer's Registration No. 4340849 are in-part identical, we must presume that the channels of trade and classes of purchasers are the same for such goods. *See Viterra Inc.*, 101 USPQ2d at 1908 (legally identical goods are presumed to travel in same channels of trade to same class of purchasers); *In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159

USPQ 721, 723 (CCPA 1968) (where there are legally identical goods, the channels of trade and classes of purchasers are considered to be the same); *United Global Media Grp., Inc. v. Tseng*, 112 USPQ2d 1039, 1049 (TTAB 2014) ("Because applicant's services encompass opposer's services, we must presume that the channels of trade and classes of purchasers are the same."). The third *DuPont* factor therefore weighs in favor of finding a likelihood of confusion for International Class 9.

Furthermore, because "cameras" are unrestricted as to classes of purchasers, we can assume that they are offered not only to a professional class of buyers with specialized expertise but also the general public. Indeed, the broadly identified "cameras" may include any type of camera, including those sold generally to consumers not requiring highly-specialized skill or knowledge to use (e.g., disposable cameras, point-and-shoot cameras, etc.). Keeping in mind that Board precedent requires us to consider the "least sophisticated consumer in the class," *Stone Lion*, 110 USPQ2d at 1163-64, and such consumers here include members of the general public, we find that the fourth *DuPont* factor also weighs in favor of finding a likelihood of confusion for the International Class 9 goods.

b)      International Class 42

The relevant International Class 42 services in the involved application include "technological services relating to design, namely, project planning and design engineering of apparatus and instruments for controlling and monitoring vehicles, of industrial automation controls, of industrial automation software, of vehicle control assistance software, of hardware for electronic driving assistance systems and of on-

board electronic systems for providing driving assistance." As discussed in connection with the second *DuPont* factor, the relevant International Class 9 goods in Opposer's Registration Nos. 4340849 include "vehicle detection equipment, namely, … application software to detect vehicle location," and the relevant International Class 9 goods identified in Opposer's Registration No. 5657073 include "downloadable software in the nature of a mobile application for monitoring, managing, tracking, communicating with and analyzing data, video and information from vehicle safety and operational systems." Neither the identification of goods and services in Opposer's Registration Nos. 4340849 and 5657073 nor the identification of services in International Class 42 of Applicant's involved application contain any limitations as to their trade channels or the purchasers to whom their goods are marketed. We must therefore assume that these goods and services move in all channels of trade that are usual for such goods and services and are available to all potential classes of consumers. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) (affirming Board finding that where the identification is unrestricted, "we must deem the goods to travel in all appropriate trade channels to all potential purchasers of such goods"); *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 56 USPQ2d 1351, 1354 (Fed. Cir. 2000); *see also In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (citing *Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)).

Although Applicant presented testimony that Applicant "does not market its products and services to any third-party distributors or after-market equipment

sellers and Applicant has no intent to do so in the U.S. market,"[152] the recitation of goods and services in Applicant's application is not so limited. The Board may not read limitations into an unrestricted identification of goods or services. *See Squirtco v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983). Moreover, Opposer presented testimony that it markets and offers its goods and services under its 3RD EYE mark to a variety of industries, including construction, education, logistics, public services, refuse, transportation, trucking, and utilities,[153] and Applicant's website suggests that Applicant targets its goods and services to many of the same industries as Opposer, such as "mining and construction," "logistics," and "marine and ports."[154] Even if Applicant were to limit its target consumer to those "using" Level 4 and 5 autonomous vehicles, the recitation of goods and services in Opposer's Registration Nos. 4340849 and 5657073 has no restrictions, and therefore Opposer's consumers may overlap with even the limited consumers that Applicant allegedly targets.

Furthermore, when considering the "least sophisticated consumer in the class," we find that, in view of the intrinsic nature of the relevant International Class 9 goods in Opposer's Registration Nos. 4340849 and 5657073 and the International Class 42

---

[152] Dubuisson Decl. at ¶ 15, 33 TTABVUE 8; *see also* Opposer's Third NOR, OTX 24, 16 TTABVUE 38 (Applicant's Response to Interrogatory No. 6: "Applicant has not started to use the TRIPLEYE Mark in U.S. Interstate commerce in connection with the goods and services identified in the TRIPLEYE Application"); Opposer's Third NOR, OTX 26, 16 TTABVUE 62 (Applicant's Response to Request for Admission No. 1: admitting that Applicant has "not used the TRIPLEYE mark in U.S. interstate commerce in connection with the goods identified in the Application").

[153] Kummer Decl. at ¶ 20, 12 TTABVUE 8.

[154] Opposer's Fifth NOR, OTX 30, 19 TTABVUE 38-47 (screenshots of Applicant's website).

services in the involved application (each of which involves software for monitoring vehicles), consumers shopping for these goods and services will exercise at least a somewhat heightened degree of consumer care. *See In re Info. Builders Inc.*, 2020 USPQ2d 10444, at *4 (TTAB 2020) ("[I]n light of the inherent nature of the goods and services involved, some degree of purchasing care may be exercised by Applicant's potential or actual consumers."). However, we cannot make a stronger finding with respect to Applicant's International Class 42 services given that the identifications of goods in Opposer's Registration Nos. 4340849 and 5657073 and the identification of services in the involved application do not contain any limitations as to their nature or price and there otherwise is no evidence to support a significantly higher level of purchasing care. Even careful or sophisticated consumers are not immune from source confusion. *See In re Rsch. and Trading Corp.*, 793 F.2d 1276, 230 USQP 49, 50 (Fed. Cir. 1986).

Accordingly, for the International Class 42 services we find the third *DuPont* factor weighs in favor of finding a likelihood of confusion, and the fourth *DuPont* factor weighs against a finding of likelihood of confusion because the consumers will exercise a somewhat heightened degree of purchasing care.

### 5. Actual Confusion or Its Absence

Under the seventh and eighth *DuPont* factors, we consider the nature and extent of actual confusion, if any, in light of the length of time and conditions under which there has been contemporaneous use of the subject marks. *DuPont*, 177 USPQ at 567.

The filing basis for the involved application is Trademark Act § 66(a), which requires an intent to use, not actual use. Given the lack of proof in the record of concurrent use of the marks at issue, the absence of actual confusion evidence is not significant. *See Cunningham*, 55 USPQ2d at 1847 (approving finding that "it could not conclude there had even been an opportunity for actual confusion").

Accordingly, the seventh and eighth *DuPont* factors are neutral.

### 6. Other *DuPont* Factors

In addition to the *DuPont* factors discussed above, the parties briefly discuss the ninth,[155] tenth,[156] eleventh,[157] twelfth,[158] and thirteenth[159] factors.[160] The parties did not present any evidence concerning the ninth, tenth, eleventh, and thirteenth *Dupont* factors. We need not consider these factors. As for the twelfth *Dupont* factor, Opposer's arguments concerning the extent of potential confusion under this factor

---

[155] The ninth *DuPont* factor considers "the variety of goods and services on which a mark is or is not used (house mark, 'family' mark, product mark)." *DuPont*, 177 USPQ at 567.

[156] The tenth *DuPont* factor is "[t]he market interface between applicant and the owner of a prior mark[.]" *DuPont*, 177 USPQ at 567.

[157] The eleventh *DuPont* factor "considers 'the extent to which applicant has a right to exclude others from use of its mark on its goods.'" *Monster Energy*, 2023 USPQ2d 87, at \*16 (quoting *DuPont*, 177 USPQ at 567).

[158] The twelfth *DuPont* factor "discusses '[t]he extent of potential confusion, i.e., whether de minimis or substantial.'" *Made in Nature*, 2022 USPQ2d 557, at \*26 (quoting *DuPont*, 177 USPQ at 567).

[159] The thirteenth *DuPont* factor considers "'[a]ny other established fact probative of the effect of use.'" *Made in Nature*, 2022 USPQ2d 557, at \*26 (quoting *DuPont*, 177 USPQ at 567).

[160] Opposer's Br., 47 TTABVUE 48-49 (discussing the eleventh and twelfth *DuPont* factor); Applicant's Br., 48 TTABVUE 42 (arguing that the tenth, eleventh, twelfth, and thirteenth factors are irrelevant)

essentially repeat arguments under the other *DuPont* factors, and have been duly considered.[161] Therefore, we treat the twelfth *DuPont* factor as neutral.

### B. Balancing the *DuPont* Factors

The final step in analyzing likelihood of confusion is to weigh the *DuPont* factors for which there has been evidence and argument; "explain the results of that weighing;" and "the weight [we] assigned to the relevant factors." *In re Charger Ventures LLC*, 65 F.4th 1375, 2023 USPQ2d 451, at *7 (Fed. Cir. 2023). "No mechanical rule determines likelihood of confusion, and each case requires weighing of the facts and circumstances of the particular mark." *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010). *See also Naterra*, 2024 USPQ2d 293, at *2. "There is no litmus rule which can provide a ready guide to all cases." *DuPont*, 177 USPQ at 567. We also keep in mind that Opposer must prove this element of its Section 2(d) claim by a preponderance of the evidence.

### 1. International Class 9

Here, the fifth, seventh, eighth, and twelfth *DuPont* factors are neutral. The goods (second *DuPont* factor) are in-part identical, and the channels of trade and classes of purchasers to whom sales are made (third *DuPont* factor) overlap. As such, the second and third *DuPont* factors favor a finding of likelihood of confusion, with the second factor strongly favoring a likelihood of confusion because the goods are in-part identical. The fourth *DuPont* factor (purchasing conditions) also favors a likelihood of confusion. The sixth *DuPont* factor (the number and nature of similar third-party

---

[161] Opposer's Br., 47 TTABVUE 48.

marks in use on similar goods) reflects weakness of EYE but not of Opposer's mark as a whole. However, consumers apparently distinguish among coexisting EYE-formative marks based on other elements, and as EYE is the only identical component of Opposer's and Applicant's marks, this weighs against likely confusion. The critical first *DuPont* factor (difference in sound, appearance, connotation, and commercial impression of the marks) weighs against a likelihood of confusion. *See Herbko,* 64 USPQ2d at 1380.

Any of the *DuPont* factors may play a dominant role. *DuPont*, 177 USPQ at 567. In some cases, even a single factor may be dispositive. *Kellogg Co. v. Pack'em Enterprises Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991). We find that the dissimilarity of the marks in sound, appearance, connotation, and commercial impression to be pivotal here insofar as it, in conjunction with the conceptual weakness of the only shared element of the parties' marks (i.e., "EYE"), outweighs the other *DuPont* factors. The respective marks overall are different enough that even when used on identical goods and services in overlapping trade channels, consumers likely would not be confused into believing that they emanate from the same source. We therefore conclude that confusion is unlikely as to Applicant's Class 9 goods.

2.      International Class 42

As with International Class 9, the fifth, seventh, eighth, and twelfth *DuPont* factors are neutral with International Class 42. The services (second *DuPont* factor) are related, and the channels of trade and classes of purchasers to whom sales are made (third *DuPont* factor) overlap. As such, the second and third *DuPont* factors

favor a finding of likelihood of confusion. For International Class 42, the fourth *DuPont* (purchasing conditions) weighs slightly against a likelihood of confusion. For the reasons discussed above, the sixth *DuPont* factor (the number and nature of similar third-party marks in use on similar goods) also weighs against likely confusion. The critical first *DuPont* factor (difference in sound, appearance, connotation, and commercial impression of the marks) weighs against a likelihood of confusion.

We find that the dissimilarity of the marks in sound, appearance, connotation, and commercial impression to again be pivotal here insofar as it, in conjunction with the conceptual weakness of the only shared element of the parties' marks (i.e., "EYE") and elevated degree of care in making purchasing decisions under the fourth *Dupont* factor, outweigh the other *DuPont* factors. The respective marks overall are different enough that, even when used on closely related goods and services in overlapping trade channels, consumers exercising greater care, and accustomed to distinguishing among EYE-formative marks in the field, likely would not be confused into believing that the services emanate from the same source. We therefore conclude that confusion is unlikely as to Applicant's Class 42 services.

**Decision:** The opposition is dismissed.

Where the Board finds that a defendant is entitled to registration even without a restriction proposed by the defendant, the Board will allow the defendant time to indicate whether it still wishes to have the restriction entered. *See* TBMP § 514.03. Accordingly, Applicant is allowed until **twenty (20) days** from the date of this

decision to notify the Board whether it wishes for its proposed amendment to be entered, failing which it will not be entered.[162] If Applicant wishes to have the proposed amendment entered, then the application will proceed to registration for Applicant's Class 9 and Class 42 goods and services with the restriction. If Applicant does not wish to have the proposed amendment entered, or otherwise does not timely respond, then the application will proceed to registration for Applicant's Class 9 and Class 42 goods and services without the restriction.

---

[162] *See* supra at pp. 25-26.